# RUST ET AL. *v.* SULLIVAN, SECRETARY OF HEALTH AND HUMAN SERVICES

No. 89–1391.   Argued October 30, 1990—Decided May 23, 1991*

---

*Together with No. 89–1392, *New York et al.* v. *Sullivan, Secretary of Health and Human Services*, also on certiorari to the same court.

174

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., filed a dissenting opinion, in which MARSHALL, J., joined, in Parts II and III of which STEVENS, J., joined, and in Part I of which O'CONNOR, J., joined, *post*, p. 203. STEVENS, J., *post*, p. 220, and O'CONNOR, J., *post*, p. 223, filed dissenting opinions.

*Laurence H. Tribe* argued the cause for petitioners in both cases. With him on the briefs for petitioners in No. 89–1391 were *Kathleen M. Sullivan, Rachael N. Pine, Janet Benshoof, Lynn Paltrow, Kathryn Kolbert, Steven R. Shapiro, Norman Siegel, Arthur Eisenberg, Roger K. Evans, Laurie R. Rockett,* and *Peter J. Rubin. Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Suzanne M. Lynn* and *Sanford M. Cohen,* Assistant Attorneys General, *Victor A. Kovner, Leonard J. Koerner, Lorna Bade Goodman, Gail Rubin,* and *Hillary Weisman* filed briefs for petitioners in No. 89–1392.

*Solicitor General Starr* argued the cause and filed a brief for respondent in both cases. With him on the brief were *Assistant Attorney General Gerson, Deputy Solicitor General Roberts, Jeffrey P. Minear, Anthony J. Steinmeyer, Lowell V. Sturgill, Jr.,* and *Joel Mangel.*†

†Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Massachusetts et al. by *David D. Cole, James M. Shannon,* Attorney General of Massachusetts, and *Ruth A. Bourquin,* Assistant Attorney General; for Anthony J. Celebrezze, Jr., Attorney General of Ohio,

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

These cases concern a facial challenge to Department of Health and Human Services (HHS) regulations which limit

et al. by *Mr. Celebrezze, pro se, Suzanne E. Mohr* and *Jack W. Decker,* Assistant Attorneys General, and *Rita S. Eppler, Douglas B. Baily,* Attorney General of Alaska, *John K. Van de Kamp,* Attorney General of California, *Clarine Nardi Riddle,* Attorney General of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Herbert O. Reid, Sr.,* Corporation Counsel for the District of Columbia, *James E. Tierney,* Attorney General of Maine, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Robert M. Spire,* Attorney General of Nebraska, *Robert J. Del Tufo,* Attorney General of New Jersey, *Dave Frohnmayer,* Attorney General of Oregon, *Jim Mattox,* Attorney General of Texas, *Jeffrey L. Amestoy,* Attorney General of Vermont, and *Mary Sue Terry,* Attorney General of Virginia; for the American College of Obstetricians and Gynecologists et al. by *Carter G. Phillips, Ann E. Allen, Kirk B. Johnson, Laurie R. Rockett, Joel I. Klein,* and *Jack R. Bierig;* for the American Library Association et al. by *Bruce J. Ennis, Jr.,* and *David W. Ogden;* for the American Public Health Association et al. by *Larry M. Lavinsky, Charles S. Sims, Michele M. Ovesey,* and *Nadine Taub;* for the Association of the Bar of the City of New York by *Conrad K. Harper, Janice Goodman,* and *Diane S. Wilner;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers* and *Charles Stephen Ralston;* for the National Association of Women Lawyers et al. by *James F. Fitzpatrick, L. Hope O'Keeffe,* and *Walter Dellinger;* for the Planned Parenthood Federation of America et al. by *Dara Klassel, Eve W. Paul,* and *Barbara E. Otten;* for Twenty-Two Biomedical Ethicists by *Michael E. Fine* and *Douglas W. Smith;* and for Representative Patricia Schroeder et al. by *David M. Becker.*

Briefs of *amici curiae* urging affirmance were filed for the American Academy of Medical Ethics by *Carolyn B. Kuhl;* for the Association of American Physicians and Surgeons by *Clarke D. Forsythe* and *Kent Masterson Brown;* for Feminists for Life of America et al. by *Edward R. Grant;* for the Knights of Columbus by *Carl A. Anderson;* for The Rutherford Institute et al. by *Wm. Charles Bundren, John W. Whitehead, A. Eric Johnston, David E. Morris, Stephen E. Hurst, Joseph P. Secola, Thomas S. Neuberger, J. Brian Heller, Thomas W. Strahan, William Bonner, Larry Crain,* and *James Knicely;* for the United States Catholic Conference by *Mark E. Chopko* and *Phillip H. Harris;* and for Senator Gordon J. Humphrey et al. by *James Bopp, Jr.,* and *Richard E. Coleson.*

Briefs of *amici curiae* were filed for the American Life League, Inc., et al. by *Robert L. Sassone;* for Catholics United for Life et al. by *Thomas*

the ability of Title X fund recipients to engage in abortion-related activities. The United States Court of Appeals for the Second Circuit upheld the regulations, finding them to be a permissible construction of the statute as well as consistent with the First and Fifth Amendments to the Constitution. We granted certiorari to resolve a split among the Courts of Appeals.[1] We affirm.

## I

## A

In 1970, Congress enacted Title X of the Public Health Service Act (Act), 84 Stat. 1506, as amended, 42 U. S. C. §§ 300 to 300a–6, which provides federal funding for family-planning services. The Act authorizes the Secretary to "make grants to and enter into contracts with public or non-profit private entities to assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." § 300(a). Grants and contracts under Title X must "be made in accordance with such regulations as the Secretary may promulgate." § 300a–4(a). Section 1008 of the Act, however, provides that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning." 42 U. S. C. § 300a–6. That restriction was intended to ensure that Title X funds would "be used only to support preventive family

---

Patrick Monaghan, Jay Alan Sekulow, Walter M. Weber, Thomas A. Glessner, Charles E. Rice, and Michael J. Laird; for the NOW Legal Defense and Education Fund et al. by John H. Hall, Sarah E. Burns, and Alison Wetherfield; and for the National Right to Life Committee Inc. et al. by James Bopp, Jr., and Richard E. Coleson.

[1] Both the First Circuit and the Tenth Circuit have invalidated the regulations, primarily on constitutional grounds. See Massachusetts v. Secretary of Health and Human Services, 899 F. 2d 53 (CA1 1990); Planned Parenthood Federation of America v. Sullivan, 913 F. 2d 1492 (CA10 1990).

planning services, population research, infertility services, and other related medical, informational, and educational activities." H. R. Conf. Rep. No. 91–1667, p. 8 (1970).

In 1988, the Secretary promulgated new regulations designed to provide "'clear and operational guidance' to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning." 53 Fed. Reg. 2923–2924 (1988). The regulations clarify, through the definition of the term "family planning," that Congress intended Title X funds "to be used only to support *preventive* family planning services." H. R. Conf. Rep. No. 91–1667, p. 8 (emphasis added). Accordingly, Title X services are limited to "preconceptional counseling, education, and general reproductive health care," and expressly exclude "pregnancy care (including obstetric or prenatal care)." 42 CFR § 59.2 (1989).[2] The regulations "focus the emphasis of the Title X program on its traditional mission: The provision of preventive family planning services specifically designed to enable individuals to determine the number and spacing of their children, while clarifying that pregnant women must be referred to appropriate prenatal care services." 53 Fed. Reg. 2925 (1988).

The regulations attach three principal conditions on the grant of federal funds for Title X projects. First, the regulations specify that a "Title X project may not provide counseling concerning the use of abortion as a method of family planning or provide referral for abortion as a method of family planning." 42 CFR § 59.8(a)(1) (1989). Because Title X is limited to preconceptional services, the program does not furnish services related to childbirth. Only in the context of a referral out of the Title X program is a pregnant woman given transitional information. § 59.8(a)(2). Title X

---

[2] "Most clients of title X-sponsored clinics are not pregnant and generally receive only physical examinations, education on contraceptive methods, and services related to birth control." General Accounting Office Report, App. 95.

projects must refer every pregnant client "for appropriate prenatal and/or social services by furnishing a list of available providers that promote the welfare of mother and unborn child." *Ibid.* The list may not be used indirectly to encourage or promote abortion, "such as by weighing the list of referrals in favor of health care providers which perform abortions, by including on the list of referral providers health care providers whose principal business is the provision of abortions, by excluding available providers who do not provide abortions, or by 'steering' clients to providers who offer abortion as a method of family planning." § 59.8(a)(3). The Title X project is expressly prohibited from referring a pregnant woman to an abortion provider, even upon specific request. One permissible response to such an inquiry is that "the project does not consider abortion an appropriate method of family planning and therefore does not counsel or refer for abortion." § 59.8(b)(5).

Second, the regulations broadly prohibit a Title X project from engaging in activities that "encourage, promote or advocate abortion as a method of family planning." § 59.10(a). Forbidden activities include lobbying for legislation that would increase the availability of abortion as a method of family planning, developing or disseminating materials advocating abortion as a method of family planning, providing speakers to promote abortion as a method of family planning, using legal action to make abortion available in any way as a method of family planning, and paying dues to any group that advocates abortion as a method of family planning as a substantial part of its activities. *Ibid.*

Third, the regulations require that Title X projects be organized so that they are "physically and financially separate" from prohibited abortion activities. § 59.9. To be deemed physically and financially separate, "a Title X project must have an objective integrity and independence from prohibited activities. Mere bookkeeping separation of Title X funds from other monies is not sufficient." *Ibid.* The regulations

provide a list of nonexclusive factors for the Secretary to consider in conducting a case-by-case determination of objective integrity and independence, such as the existence of separate accounting records and separate personnel, and the degree of physical separation of the project from facilities for prohibited activities.  *Ibid.*

### B

Petitioners are Title X grantees and doctors who supervise Title X funds suing on behalf of themselves and their patients.  Respondent is the Secretary of HHS.  After the regulations had been promulgated, but before they had been applied, petitioners filed two separate actions, later consolidated, challenging the facial validity of the regulations and seeking declaratory and injunctive relief to prevent implementation of the regulations.  Petitioners challenged the regulations on the grounds that they were not authorized by Title X and that they violate the First and Fifth Amendment rights of Title X clients and the First Amendment rights of Title X health providers.  After initially granting petitioners a preliminary injunction, the District Court rejected petitioners' statutory and constitutional challenges to the regulations and granted summary judgment in favor of the Secretary. *New York* v. *Bowen*, 690 F. Supp. 1261 (SDNY 1988).

A panel of the Court of Appeals for the Second Circuit affirmed.  889 F. 2d 401 (1989).  Applying this Court's decision in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842–843 (1984), the Court of Appeals determined that the regulations were a permissible construction of the statute that legitimately effectuated congressional intent.  The court rejected as "highly strained," petitioners' contention that the plain language of § 1008 forbids Title X projects only from performing abortions.  The court reasoned that "it would be wholly anomalous to read Section 1008 to mean that a program that merely counsels but does not perform abortions does not include abortion as a 'method of family planning.'"  889 F. 2d, at 407.  "[T]he nat-

ural construction of . . . the term 'method of family planning' includes counseling concerning abortion." *Ibid.* The court found this construction consistent with the legislative history and observed that "[a]ppellants' contrary view of the legislative history is based entirely on highly generalized statements about the expansive scope of the family planning services" that "do not specifically mention counseling concerning abortion as an intended service of Title X projects" and that "surely cannot be read to trump a section of the statute that specifically excludes it." *Id.*, at 407–408.

Turning to petitioners' constitutional challenges to the regulations, the Court of Appeals rejected petitioners' Fifth Amendment challenge. It held that the regulations do not impermissibly burden a woman's right to an abortion because the "government may validly choose to favor childbirth over abortion and to implement that choice by funding medical services relating to childbirth but not those relating to abortion." *Id.*, at 410. Finding that the prohibition on the performance of abortions upheld by the Court in *Webster* v. *Reproductive Health Services*, 492 U. S. 490 (1989), was "substantially greater in impact than the regulations challenged in the instant matter," 889 F. 2d, at 411, the court concluded that the regulations "create[d] no affirmative legal barriers to access to abortion." *Ibid.*, citing *Webster* v. *Reproductive Health Services.*

The court likewise found that the "Secretary's implementation of Congress's decision not to fund abortion counseling, referral or advocacy also does not, under applicable Supreme Court precedent, constitute a facial violation of the First Amendment rights of health care providers or of women." 889 F. 2d, at 412. The court explained that under *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540 (1983), the Government has no obligation to subsidize even the exercise of fundamental rights, including "speech rights." The court also held that the regulations do not violate the First Amendment by "condition[ing] receipt of a benefit on the

relinquishment of constitutional rights" because Title X grantees and their employees "remain free to say whatever they wish about abortion outside the Title X project." 889 F. 2d, at 412. Finally, the court rejected petitioners' contention that the regulations "facially discriminate on the basis of the viewpoint of the speech involved." *Id.*, at 414.

## II

We begin by pointing out the posture of the cases before us. Petitioners are challenging the *facial* validity of the regulations. Thus, we are concerned only with the question whether, on their face, the regulations are both authorized by the Act and can be construed in such a manner that they can be applied to a set of individuals without infringing upon constitutionally protected rights. Petitioners face a heavy burden in seeking to have the regulations invalidated as facially unconstitutional. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid. The fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid." *United States* v. *Salerno*, 481 U. S. 739, 745 (1987).

We turn first to petitioners' contention that the regulations exceed the Secretary's authority under Title X and are arbitrary and capricious. We begin with an examination of the regulations concerning abortion counseling, referral, and advocacy, which every Court of Appeals has found to be authorized by the statute, and then turn to the "program integrity requirement," with respect to which the courts below have adopted conflicting positions. We then address petitioners' claim that the regulations must be struck down because they raise a substantial constitutional question.

## A

We need not dwell on the plain language of the statute because we agree with every court to have addressed the issue that the language is ambiguous. The language of § 1008 — that "[n]one of the funds appropriated under this subchapter shall be used in programs where abortion is a method of family planning"—does not speak directly to the issues of counseling, referral, advocacy, or program integrity. If a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U. S., at 842–843.

The Secretary's construction of Title X may not be disturbed as an abuse of discretion if it reflects a plausible construction of the plain language of the statute and does not otherwise conflict with Congress' expressed intent. *Ibid.* In determining whether a construction is permissible, "[t]he court need not conclude that the agency construction was the only one it permissibly could have adopted . . . or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.,* at 843, n. 11. Rather, substantial deference is accorded to the interpretation of the authorizing statute by the agency authorized with administering it. *Id.,* at 844.

The broad language of Title X plainly allows the Secretary's construction of the statute. By its own terms, § 1008 prohibits the use of Title X funds "in programs where abortion is a method of family planning." Title X does not define the term "method of family planning," nor does it enumerate what types of medical and counseling services are entitled to Title X funding. Based on the broad directives provided by Congress in Title X in general and § 1008 in particular, we are unable to say that the Secretary's construction of the prohibition in § 1008 to require a ban on counseling, referral, and advocacy within the Title X project is impermissible.

The District Courts and Courts of Appeals that have examined the legislative history have all found, at least with regard to the Act's counseling, referral, and advocacy provisions, that the legislative history is ambiguous with respect to Congress' intent in enacting Title X and the prohibition of § 1008. *Massachusetts* v. *Secretary of Health and Human Services,* 899 F. 2d 53, 62 (CA1 1990) ("Congress has not addressed specifically the question of the scope of the abortion prohibition. The language of the statute and the legislative history can support either of the litigants' positions"); *Planned Parenthood Federation of America* v. *Sullivan,* 913 F. 2d 1492, 1497 (CA10 1990) ("[T]he contemporaneous legislative history does not address whether clinics receiving Title X funds can engage in nondirective counseling including the abortion option and referrals"); 889 F. 2d, at 407 (case below) ("Nothing in the legislative history of Title X detracts" from the Secretary's construction of § 1008). We join these courts in holding that the legislative history is ambiguous and fails to shed light on relevant congressional intent. At no time did Congress directly address the issues of abortion counseling, referral, or advocacy. The parties' attempts to characterize highly generalized, conflicting statements in the legislative history into accurate revelations of congressional intent are unavailing.[3]

---

[3] For instance, the Secretary relies on the following passage of the House Report as evidence that the regulations are consistent with legislative intent:

"It is, and has been, the intent of both Houses that the funds authorized under this legislation be used only to support preventive family planning services, population research, infertility services, and other related medical, informational, and educational activities. The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make this intent clear." H. R. Conf. Rep. No. 91–1667, p. 8 (1970).

Petitioners, however, point to language in the statement of purpose in the House Report preceding the passage of Title X stressing the importance of supplying both family planning information and a full range of family plan-

When we find, as we do here, that the legislative history is ambiguous and unenlightening on the matters with respect to which the regulations deal, we customarily defer to the expertise of the agency. Petitioners argue, however, that the regulations are entitled to little or no deference because they "reverse a longstanding agency policy that permitted nondirective counseling and referral for abortion," Brief for Petitioners in No. 89–1392, p. 20, and thus represent a sharp break from the Secretary's prior construction of the statute. Petitioners argue that the agency's prior consistent interpretation of § 1008 to permit nondirective counseling and to encourage coordination with local and state family planning services is entitled to substantial weight.

This Court has rejected the argument that an agency's interpretation "is not entitled to deference because it represents a sharp break with prior interpretations" of the statute in question. *Chevron*, 467 U. S., at 862. In *Chevron*, we held that a revised interpretation deserves deference because "[a]n initial agency interpretation is not instantly carved in stone" and "the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis." *Id.*, at 863–864. An agency is not required to "'establish rules of conduct to last forever,'" *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State*

ning information and of developing a comprehensive and coordinated program. Petitioners also rely on the Senate Report, which states:

"The committee does not view family planning as merely a euphemism for birth control. It is properly a part of comprehensive health care and should consist of much more than the dispensation of contraceptive devices. . . . [A] successful family planning program must contain . . . [m]edical services, including consultation examination, prescription, and continuing supervision, supplies, instruction, and referral to other medical services as needed." S. Rep. No. 91–1004, p. 10 (1970).

These directly conflicting statements of legislative intent demonstrate amply the inadequacies of the "traditional tools of statutory construction," *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 446–447 (1987), in resolving the issue before us.

*Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 42 (1983), quoting *American Trucking Assns., Inc.* v. *Atchison, T. & S. F. R. Co.*, 387 U. S. 397, 416 (1967); *NLRB* v. *Curtin Matheson Scientific, Inc.*, 494 U. S. 775 (1990), but rather "must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" *Motor Vehicle Mfrs., supra*, at 42, quoting *Permian Basin Area Rate Cases*, 390 U. S. 747, 784 (1968).

We find that the Secretary amply justified his change of interpretation with a "reasoned analysis." *Motor Vehicle Mfrs., supra*, at 42. The Secretary explained that the regulations are a result of his determination, in the wake of the critical reports of the General Accounting Office (GAO) and the Office of the Inspector General (OIG), that prior policy failed to implement properly the statute and that it was necessary to provide "'clear and operational guidance' to grantees about how to preserve the distinction between Title X programs and abortion as a method of family planning." 53 Fed. Reg. 2923–2924 (1988). He also determined that the new regulations are more in keeping with the original intent of the statute, are justified by client experience under the prior policy, and are supported by a shift in attitude against the "elimination of unborn children by abortion." We believe that these justifications are sufficient to support the Secretary's revised approach. Having concluded that the plain language and legislative history are ambiguous as to Congress' intent in enacting Title X, we must defer to the Secretary's permissible construction of the statute.

B

We turn next to the "program integrity" requirements embodied at § 59.9 of the regulations, mandating separate facilities, personnel, and records. These requirements are not inconsistent with the plain language of Title X. Petitioners contend, however, that they are based on an impermissible construction of the statute because they frustrate the clearly

expressed intent of Congress that Title X programs be an integral part of a broader, comprehensive, health-care system. They argue that this integration is impermissibly burdened because the efficient use of non-Title-X funds by Title X grantees will be adversely affected by the regulations.

The Secretary defends the separation requirements of § 59.9 on the grounds that they are necessary to assure that Title X grantees apply federal funds only to federally authorized purposes and that grantees avoid creating the appearance that the Government is supporting abortion-related activities. The program integrity regulations were promulgated in direct response to the observations in the GAO and OIG reports that "[b]ecause the distinction between the recipients' title X and other activities may not be easily recognized, the public can get the impression that Federal funds are being improperly used for abortion activities." App. 85. The Secretary concluded:

> "[M]eeting the requirement of section 1008 mandates that Title X programs be organized so that they are physically and financially separate from other activities which are prohibited from inclusion in a Title X program. Having a program that is separate from such activities is a necessary predicate to any determination that abortion is not being included as a method of family planning in the Title X program." 53 Fed. Reg. 2940 (1988).

The Secretary further argues that the separation requirements do not represent a deviation from past policy because the agency has consistently taken the position that § 1008 requires some degree of physical and financial separation between Title X projects and abortion-related activities.

We agree that the program integrity requirements are based on a permissible construction of the statute and are not inconsistent with congressional intent. As noted, the legislative history is clear about very little, and program integrity is no exception. The statements relied upon by petitioners

to infer such an intent are highly generalized and do not directly address the scope of § 1008.

For example, the cornerstone of the conclusion that in Title X Congress intended a comprehensive, integrated system of family planning services is the statement in the statute requiring state health authorities applying for Title X funds to submit "a State plan for a coordinated and comprehensive program of family planning services." § 1002. This statement is, on its face, ambiguous as to Congress' intent in enacting Title X and the prohibition of § 1008. Placed in context, the statement merely requires that a state health authority submit a plan for a "coordinated and comprehensive program of family planning services" in order to be eligible for Title X funds. By its own terms, the language evinces Congress' intent to place a duty on state entities seeking federal funds; it does not speak either to an overall view of family planning services or to the Secretary's responsibility for implementing the statute. Likewise, the statement in the original House Report on Title X that the Act was "not intended to interfere with or limit programs conducted in accordance with State or local laws" and supported through non-Title X funds is equally unclear. H. R. Conf. Rep. No. 91–1667, pp. 8–9 (1970). This language directly follows the statement that it is the "intent of both Houses that the funds authorized under this legislation be used only to support preventive family planning services . . . . The conferees have adopted the language contained in section 1008, which prohibits the use of such funds for abortion, in order to make this intent clear." *Id.*, at 8. When placed in context and read in light of the express prohibition of § 1008, the statements fall short of evidencing a congressional intent that would render the Secretary's interpretation of the statute impermissible.

While petitioners' interpretation of the legislative history may be a permissible one, it is by no means the only one, and it is certainly not the one found by the Secretary. It is well

established that legislative history which does not demonstrate a clear and certain congressional intent cannot form the basis for enjoining regulations. See *Motor Vehicle Mfrs.*, 463 U. S., at 42. The Secretary based the need for the separation requirements "squarely on the congressional intent that abortion not be a part of a Title X funded program." · 52 Fed. Reg. 33212 (1987). Indeed, if one thing is clear from the legislative history, it is that Congress intended that Title X funds be kept separate and distinct from abortion-related activities. It is undisputed that Title X was intended to provide primarily prepregnancy preventive services. Certainly the Secretary's interpretation of the statute that separate facilities are necessary, especially in light of the express prohibition of § 1008, cannot be judged unreasonable. Accordingly, we defer to the Secretary's reasoned determination that the program integrity requirements are necessary to implement the prohibition.

Petitioners also contend that the regulations must be invalidated because they raise serious questions of constitutional law. They rely on *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568 (1988), and *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490 (1979), which hold that "an Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *Id.*, at 500. Under this canon of statutory construction, "'[t]he elementary rule is that every reasonable construction must be resorted to, in order to *save* a *statute* from unconstitutionality.'" *DeBartolo Corp., supra*, at 575 (emphasis added), quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895).

The principle enunciated in *Hooper* v. *California, supra*, and subsequent cases, is a categorical one: "as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act." *Blodgett* v. *Holden*, 275 U. S. 142, 148 (1927) (opinion of Holmes, J.). This principle

is based at least in part on the fact that a decision to declare an Act of Congress unconstitutional "is the gravest and most delicate duty that this Court is called on to perform." *Ibid.* Following *Hooper, supra,* cases such as *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909), and *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401 (1916), developed the corollary doctrine that "[a] statute must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations. *FTC* v. *American Tobacco Co.,* 264 U. S. 298, 305–307 (1924). It is qualified by the proposition that "avoidance of a difficulty will not be pressed to the point of disingenuous evasion." *George Moore Ice Cream Co.* v. *Rose,* 289 U. S. 373, 379 (1933).

Here Congress forbade the use of appropriated funds in programs where abortion is a method of family planning. It authorized the Secretary to promulgate regulations implementing this provision. The extensive litigation regarding governmental restrictions on abortion since our decision in *Roe* v. *Wade,* 410 U. S. 113 (1973), suggests that it was likely that any set of regulations promulgated by the Secretary— other than the ones in force prior to 1988 and found by him to be relatively toothless and ineffectual—would be challenged on constitutional grounds. While we do not think that the constitutional arguments made by petitioners in these cases are without some force, in Part III, *infra,* we hold that they do not carry the day. Applying the canon of construction under discussion as best we can, we hold that the regulations promulgated by the Secretary do not raise the sort of "grave and doubtful constitutional questions," *Delaware & Hudson Co., supra,* at 408, that would lead us to assume Congress did not intend to authorize their issuance. Therefore, we need not invalidate the regulations in order to save the statute from unconstitutionality.

## III

Petitioners contend that the regulations violate the First Amendment by impermissibly discriminating based on viewpoint because they prohibit "all discussion about abortion as a lawful option—including counseling, referral, and the provision of neutral and accurate information about ending a pregnancy—while compelling the clinic or counselor to provide information that promotes continuing a pregnancy to term." Brief for Petitioners in No. 89–1391, p. 11. They assert that the regulations violate the "free speech rights of private health care organizations that receive Title X funds, of their staff, and of their patients" by impermissibly imposing "viewpoint-discriminatory conditions on government subsidies" and thus "penaliz[e] speech funded with non-Title X monies." *Id.*, at 13, 14, 24. Because "Title X continues to fund speech ancillary to pregnancy testing in a manner that is not even-handed with respect to views and information about abortion, it invidiously discriminates on the basis of viewpoint." *Id.*, at 18. Relying on *Regan* v. *Taxation with Representation of Wash.*, 461 U. S. 540 (1983), and *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 234 (1987), petitioners also assert that while the Government may place certain conditions on the receipt of federal subsidies, it may not "discriminate invidiously in its subsidies in such a way as to 'ai[m] at the suppression of dangerous ideas.'" *Regan, supra,* at 548 (quoting *Cammarano* v. *United States*, 358 U. S. 498, 513 (1959)).

There is no question but that the statutory prohibition contained in § 1008 is constitutional. In *Maher* v. *Roe*, 432 U. S. 464 (1977), we upheld a state welfare regulation under which Medicaid recipients received payments for services related to childbirth, but not for nontherapeutic abortions. The Court rejected the claim that this unequal subsidization worked a violation of the Constitution. We held that the government may "make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allo-

cation of public funds." *Id.*, at 474. Here the Government is exercising the authority it possesses under *Maher* and *Harris* v. *McRae*, 448 U. S. 297 (1980), to subsidize family planning services which will lead to conception and childbirth, and declining to "promote or encourage abortion." The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way. In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other. "[A] legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan, supra,* at 549. See also *Buckley* v. *Valeo,* 424 U. S. 1 (1976); *Cammarano* v. *United States, supra.* "A refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity." *McRae, supra,* at 317, n. 19. "There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy." *Maher, supra,* at 475.

The challenged regulations implement the statutory prohibition by prohibiting counseling, referral, and the provision of information regarding abortion as a method of family planning. They are designed to ensure that the limits of the federal program are observed. The Title X program is designed not for prenatal care, but to encourage family planning. A doctor who wished to offer prenatal care to a project patient who became pregnant could properly be prohibited from doing so because such service is outside the scope of the federally funded program. The regulations prohibiting abortion counseling and referral are of the same ilk; "no funds appropriated for the project may be used in programs where abortion is a method of family planning," and a doctor employed by the project may be prohibited in

the course of his project duties from counseling abortion or referring for abortion. This is not a case of the Government "suppressing a dangerous idea," but of a prohibition on a project grantee or its employees from engaging in activities outside of the project's scope.

To hold that the Government unconstitutionally discriminates on the basis of viewpoint when it chooses to fund a program dedicated to advance certain permissible goals, because the program in advancing those goals necessarily discourages alternative goals, would render numerous Government programs constitutionally suspect. When Congress established a National Endowment for Democracy to encourage other countries to adopt democratic principles, 22 U. S. C. § 4411(b), it was not constitutionally required to fund a program to encourage competing lines of political philosophy such as communism and fascism. Petitioners' assertions ultimately boil down to the position that if the Government chooses to subsidize one protected right, it must subsidize analogous counterpart rights. But the Court has soundly rejected that proposition. *Regan* v. *Taxation with Representation of Wash.*, *supra*; *Maher* v. *Roe*, *supra*; *Harris* v. *McRae*, *supra*. Within far broader limits than petitioners are willing to concede, when the Government appropriates public funds to establish a program it is entitled to define the limits of that program.

We believe that petitioners' reliance upon our decision in *Arkansas Writers' Project*, *supra*, is misplaced. That case involved a state sales tax which discriminated between magazines on the basis of their content. Relying on this fact, and on the fact that the tax "targets a small group within the press," contrary to our decision in *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983), the Court held the tax invalid. But we have here not the case of a general law singling out a disfavored group on the basis of speech content, but a case of the Government re-

fusing to fund activities, including speech, which are specifically excluded from the scope of the project funded.

Petitioners rely heavily on their claim that the regulations would not, in the circumstance of a medical emergency, permit a Title X project to refer a woman whose pregnancy places her life in imminent peril to a provider of abortions or abortion-related services. These cases, of course, involve only a facial challenge to the regulations, and we do not have before us any application by the Secretary to a specific fact situation. On their face, we do not read the regulations to bar abortion referral or counseling in such circumstances. Abortion counseling as a "method of family planning" is prohibited, and it does not seem that a medically necessitated abortion in such circumstances would be the equivalent of its use as a "method of family planning." Neither § 1008 nor the specific restrictions of the regulations would apply. Moreover, the regulations themselves contemplate that a Title X project would be permitted to engage in otherwise-prohibited, abortion-related activity in such circumstances. Section 59.8(a)(2) provides a specific exemption for emergency care and requires Title X recipients "to refer the client immediately to an appropriate provider of emergency medical services." 42 CFR § 59.8(a)(2) (1989). Section 59.5(b)(1) also requires Title X projects to provide "necessary referral to other medical facilities when medically indicated."[4]

---

[4] We also find that, on their face, the regulations are narrowly tailored to fit Congress' intent in Title X that federal funds not be used to "promote or advocate" abortion as a "method of family planning." The regulations are designed to ensure compliance with the prohibition of § 1008 that none of the funds appropriated under Title X be used in a program where abortion is a method of family planning. We have recognized that Congress' power to allocate funds for public purposes includes an ancillary power to ensure that those funds are properly applied to the prescribed use. See *South Dakota* v. *Dole*, 483 U. S. 203, 207–209 (1987) (upholding against Tenth Amendment challenge requirement that States raise drinking age as condition to receipt of federal highway funds); *Buckley* v. *Valeo*, 424 U. S. 1, 99 (1976).

Petitioners also contend that the restrictions on the subsidization of abortion-related speech contained in the regulations are impermissible because they condition the receipt of a benefit, in these cases Title X funding, on the relinquishment of a constitutional right, the right to engage in abortion advocacy and counseling. Relying on *Perry* v. *Sindermann*, 408 U. S. 593, 597 (1972), and *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364 (1984), petitioners argue that "even though the government may deny [a] . . . benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests — especially, his interest in freedom of speech." *Perry, supra*, at 597.

Petitioners' reliance on these cases is unavailing, however, because here the Government is not denying a benefit to anyone, but is instead simply insisting that public funds be spent for the purposes for which they were authorized. The Secretary's regulations do not force the Title X grantee to give up abortion-related speech; they merely require that the grantee keep such activities separate and distinct from Title X activities. Title X expressly distinguishes between a Title X *grantee* and a Title X *project*. The grantee, which normally is a health-care organization, may receive funds from a variety of sources for a variety of purposes. Brief for Petitioners in No. 89–1391, pp. 3, n. 5, 13. The grantee receives Title X funds, however, for the specific and limited purpose of establishing and operating a Title X project. 42 U. S. C. § 300(a). The regulations govern the scope of the Title X *project's* activities, and leave the grantee unfettered in its other activities. The Title X *grantee* can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy; it simply is required to conduct those activities through programs that are separate and independent from the project that receives Title X funds. 42 CFR § 59.9 (1989).

In contrast, our "unconstitutional conditions" cases involve situations in which the Government has placed a condition on the *recipient* of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program. In *FCC* v. *League of Women Voters of Cal.*, we invalidated a federal law providing that noncommercial television and radio stations that receive federal grants may not "engage in editorializing." Under that law, a recipient of federal funds was "barred absolutely from all editorializing" because it "is not able to segregate its activities according to the source of its funding" and thus "has no way of limiting the use of its federal funds to all noneditorializing activities." The effect of the law was that "a noncommercial educational station that receives only 1% of its overall income from [federal] grants is barred absolutely from all editorializing" and "barred from using even wholly private funds to finance its editorial activity." 468 U. S., at 400. We expressly recognized, however, that were Congress to permit the recipient stations to "establish 'affiliate' organizations which could then use the station's facilities to editorialize with nonfederal funds, such a statutory mechanism would plainly be valid." *Ibid.* Such a scheme would permit the station "to make known its views on matters of public importance through its nonfederally funded, editorializing affiliate without losing federal grants for its non-editorializing broadcast activities." *Ibid.*

Similarly, in *Regan* we held that Congress could, in the exercise of its spending power, reasonably refuse to subsidize the lobbying activities of tax-exempt charitable organizations by prohibiting such organizations from using tax-deductible contributions to support their lobbying efforts. In so holding, we explained that such organizations remained free "to receive deductible contributions to support . . . nonlobbying activit[ies]." 461 U. S., at 545. Thus, a charitable organization could create, under § 501(c)(3) of the Internal

Revenue Code of 1954, 26 U. S. C. §501(c)(3), an affiliate to conduct its nonlobbying activities using tax-deductible contributions, and at the same time establish, under §501 (c)(4), a separate affiliate to pursue its lobbying efforts without such contributions. 461 U. S., at 544. Given that alternative, the Court concluded that "Congress has not infringed any First Amendment rights or regulated any First Amendment activity[; it] has simply chosen not to pay for [appellee's] lobbying." Id., at 546. We also noted that appellee "would, of course, have to ensure that the §501(c)(3) organization did not subsidize the §501(c)(4) organization; otherwise, public funds might be spent on an activity Congress chose not to subsidize." Id., at 544. The condition that federal funds will be used only to further the purposes of a grant does not violate constitutional rights. "Congress could, for example, grant funds to an organization dedicated to combating teenage drug abuse, but condition the grant by providing that none of the money received from Congress should be used to lobby state legislatures." See id., at 548.

By requiring that the Title X grantee engage in abortion-related activity separately from activity receiving federal funding, Congress has, consistent with our teachings in *League of Women Voters* and *Regan*, not denied it the right to engage in abortion-related activities. Congress has merely refused to fund such activities out of the public fisc, and the Secretary has simply required a certain degree of separation from the Title X project in order to ensure the integrity of the federally funded program.

The same principles apply to petitioners' claim that the regulations abridge the free speech rights of the grantee's staff. Individuals who are voluntarily employed for a Title X project must perform their duties in accordance with the regulation's restrictions on abortion counseling and referral. The employees remain free, however, to pursue abortion-related activities when they are not acting under the auspices of the Title X project. The regulations, which govern solely

the scope of the Title X project's activities, do not in any way restrict the activities of those persons acting as private individuals. The employees' freedom of expression is limited during the time that they actually work for the project; but this limitation is a consequence of their decision to accept employment in a project, the scope of which is permissibly restricted by the funding authority.[5]

This is not to suggest that funding by the Government, even when coupled with the freedom of the fund recipients to speak outside the scope of the Government-funded project, is invariably sufficient to justify Government control over the content of expression. For example, this Court has recog-

---

[5] Petitioners also contend that the regulations violate the First Amendment by penalizing speech funded with non-Title X moneys. They argue that since Title X requires that grant recipients contribute to the financing of Title X projects through the use of matching funds and grant-related income, the regulation's restrictions on abortion counseling and advocacy penalize privately funded speech.

We find this argument flawed for several reasons. First, Title X subsidies are just that, subsidies. The recipient is in no way compelled to operate a Title X project; to avoid the force of the regulations, it can simply decline the subsidy. See Grove City College v. Bell, 465 U. S. 555, 575 (1984) (petitioner's First Amendment rights not violated because it "may terminate its participation in the [federal] program and thus avoid the requirements of [the federal program]"). By accepting Title X funds, a recipient voluntarily consents to any restrictions placed on any matching funds or grant-related income. Potential grant recipients can choose between accepting Title X funds—subject to the Government's conditions that they provide matching funds and forgo abortion counseling and referral in the Title X project—or declining the subsidy and financing their own unsubsidized program. We have never held that the Government violates the First Amendment simply by offering that choice. Second, the Secretary's regulations apply only to Title X programs. A recipient is therefore able to "limi[t] the use of its federal funds to [Title X] activities." FCC v. League of Women Voters of Cal., 468 U. S. 364, 400 (1984). It is in no way "barred from using even wholly private funds to finance" its pro-abortion activities outside the Title X program. Ibid. The regulations are limited to Title X funds; the recipient remains free to use private, non-Title X funds to finance abortion-related activities.

nized that the existence of a Government "subsidy," in the form of Government-owned property, does not justify the restriction of speech in areas that have "been traditionally open to the public for expressive activity," *United States* v. *Kokinda*, 497 U. S. 720, 726 (1990); *Hague* v. *CIO*, 307 U. S. 496, 515 (1939) (opinion of Roberts, J.), or have been "expressly dedicated to speech activity." *Kokinda, supra,* at 726; *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983). Similarly, we have recognized that the university is a traditional sphere of free expression so fundamental to the functioning of our society that the Government's ability to control speech within that sphere by means of conditions attached to the expenditure of Government funds is restricted by the vagueness and overbreadth doctrines of the First Amendment, *Keyishian* v. *Board of Regents, State Univ. of N. Y.*, 385 U. S. 589, 603, 605–606 (1967). It could be argued by analogy that traditional relationships such as that between doctor and patient should enjoy protection under the First Amendment from Government regulation, even when subsidized by the Government. We need not resolve that question here, however, because the Title X program regulations do not significantly impinge upon the doctor-patient relationship. Nothing in them requires a doctor to represent as his own any opinion that he does not in fact hold. Nor is the doctor-patient relationship established by the Title X program sufficiently all encompassing so as to justify an expectation on the part of the patient of comprehensive medical advice. The program does not provide postconception medical care, and therefore a doctor's silence with regard to abortion cannot reasonably be thought to mislead a client into thinking that the doctor does not consider abortion an appropriate option for her. The doctor is always free to make clear that advice regarding abortion is simply beyond the scope of the program. In these circumstances, the general rule that the Government may choose not to subsidize speech applies with full force.

## IV

We turn now to petitioners' argument that the regulations violate a woman's Fifth Amendment right to choose whether to terminate her pregnancy. We recently reaffirmed the long-recognized principle that "'the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.'" *Webster*, 492 U. S., at 507, quoting *DeShaney* v. *Winnebago County Dept. of Social Services*, 489 U. S. 189, 196 (1989). The Government has no constitutional duty to subsidize an activity merely because the activity is constitutionally protected and may validly choose to fund childbirth over abortion and "'implement that judgment by the allocation of public funds'" for medical services relating to childbirth but not to those relating to abortion. *Webster*, *supra*, at 510 (citation omitted). The Government has no affirmative duty to "commit any resources to facilitating abortions," *Webster*, 492 U. S., at 511, and its decision to fund childbirth but not abortion "places no governmental obstacle in the path of a woman who chooses to terminate her pregnancy, but rather, by means of unequal subsidization of abortion and other medical services, encourages alternative activity deemed in the public interest." *McRae*, 448 U. S., at 315.

That the regulations do not impermissibly burden a woman's Fifth Amendment rights is evident from the line of cases beginning with *Maher* and *McRae* and culminating in our most recent decision in *Webster*. Just as Congress' refusal to fund abortions in *McRae* left "an indigent woman with at least the same range of choice in deciding whether to obtain a medically necessary abortion as she would have had if Congress had chosen to subsidize no health care costs at all," 448 U. S., at 317, and "Missouri's refusal to allow public employees to perform abortions in public hospitals leaves a pregnant woman with the same choices as if the State had chosen not

to operate any public hospitals," *Webster, supra,* at 509, Congress' refusal to fund abortion counseling and advocacy leaves a pregnant woman with the same choices as if the Government had chosen not to fund family-planning services at all. The difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral leaves her in no different position than she would have been if the Government had not enacted Title X.

In *Webster,* we stated that "[h]aving held that the State's refusal [in *Maher*] to fund abortions does not violate *Roe* v. *Wade,* it strains logic to reach a contrary result for the use of public facilities and employees." 492 U. S., at 509–510. It similarly would strain logic, in light of the more extreme restrictions in those cases, to find that the mere decision to exclude abortion-related services from a federally funded *preconceptional* family planning program is unconstitutional.

Petitioners also argue that by impermissibly infringing on the doctor-patient relationship and depriving a Title X client of information concerning abortion as a method of family planning, the regulations violate a woman's Fifth Amendment right to medical self-determination and to make informed medical decisions free of government-imposed harm. They argue that under our decisions in *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416 (1983), and *Thornburgh* v. *American College of Obstetricians and Gynecologists,* 476 U. S. 747 (1986), the Government cannot interfere with a woman's right to make an informed and voluntary choice by placing restrictions on the patient-doctor dialogue.

In *Akron,* we invalidated a city ordinance requiring *all* physicians to make specified statements to the patient prior to performing an abortion in order to ensure that the woman's consent was "truly informed." 462 U. S., at 423. Similarly, in *Thornburgh,* we struck down a state statute mandating that a list of agencies offering alternatives to abortion and a description of fetal development be provided to *every* woman considering terminating her pregnancy through an

abortion. Critical to our decisions in *Akron* and *Thornburgh* to invalidate a governmental intrusion into the patient-doctor dialogue was the fact that the laws in both cases required *all* doctors within their respective jurisdictions to provide *all* pregnant patients contemplating an abortion a litany of information, regardless of whether the patient sought the information or whether the doctor thought the information necessary to the patient's decision. Under the Secretary's regulations, however, a doctor's ability to provide, and a woman's right to receive, information concerning abortion and abortion-related services outside the context of the Title X project remains unfettered. It would undoubtedly be easier for a woman seeking an abortion if she could receive information about abortion from a Title X project, but the Constitution does not require that the Government distort the scope of its mandated program in order to provide that information.

Petitioners contend, however, that most Title X clients are effectively precluded by indigency and poverty from seeing a health-care provider who will provide abortion-related services. But once again, even these Title X clients are in no worse position than if Congress had never enacted Title X. "The financial constraints that restrict an indigent woman's ability to enjoy the full range of constitutionally protected freedom of choice are the product not of governmental restrictions on access to abortion, but rather of her indigency." *McRae, supra,* at 316.

The Secretary's regulations are a permissible construction of Title X and do not violate either the First or Fifth Amendments to the Constitution. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE BLACKMUN, with whom JUSTICE MARSHALL joins, with whom JUSTICE STEVENS joins as to Parts II and

III, and with whom JUSTICE O'CONNOR joins as to Part I, dissenting.

Casting aside established principles of statutory construction and administrative jurisprudence, the majority in these cases today unnecessarily passes upon important questions of constitutional law. In so doing, the Court, for the first time, upholds viewpoint-based suppression of speech solely because it is imposed on those dependent upon the Government for economic support. Under essentially the same rationale, the majority upholds direct regulation of dialogue between a pregnant woman and her physician when that regulation has both the purpose and the effect of manipulating her decision as to the continuance of her pregnancy. I conclude that the Secretary's regulation of referral, advocacy, and counseling activities exceeds his statutory authority, and, also, that the regulations violate the First and Fifth Amendments of our Constitution. Accordingly, I dissent and would reverse the divided-vote judgment of the Court of Appeals.

## I

The majority does not dispute that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." *Machinists* v. *Street*, 367 U. S. 740, 749 (1961). See also *Hooper* v. *California*, 155 U. S. 648, 657 (1895); *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932); *United States* v. *Security Industrial Bank*, 459 U. S. 70, 78 (1982). Nor does the majority deny that this principle is fully applicable to cases such as the instant ones in which a plausible but constitutionally suspect statutory interpretation is embodied in an administrative regulation. See *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988); *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490 (1979); *Kent* v. *Dulles*, 357 U. S. 116, 129–130 (1958). Rather, in its zeal to address the constitutional issues, the majority sidesteps this established canon of construction with the feeble excuse that the chal-

lenged regulations "do not raise the sort of 'grave and doubtful constitutional questions,' . . . that would lead us to assume Congress did not intend to authorize their issuance." *Ante*, at 191, quoting *United States ex rel. Attorney General* v. *Delaware & Hudson Co.*, 213 U. S. 366, 408 (1909).

This facile response to the intractable problem the Court addresses today is disingenuous at best. Whether or not one believes that these regulations are valid, it avoids reality to contend that they do not give rise to serious constitutional questions. The canon is applicable to these cases not because "it was likely that [the regulations] . . . would be challenged on constitutional grounds," *ante*, at 191, but because the question squarely presented by the regulations — the extent to which the Government may attach an otherwise unconstitutional condition to the receipt of a public benefit — implicates a troubled area of our jurisprudence in which a court ought not entangle itself unnecessarily. See, *e. g.*, Epstein, Unconstitutional Conditions, State Power, and the Limits of Consent, 102 Harv. L. Rev. 4, 6 (1988) (describing this problem as "the basic structural issue that for over a hundred years has bedeviled courts and commentators alike . . ."); Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1415–1416 (1989) (observing that this Court's unconstitutional conditions cases "seem a minefield to be traversed gingerly").

As is discussed in Parts II and III, *infra*, the regulations impose viewpoint-based restrictions upon protected speech and are aimed at a woman's decision whether to continue or terminate her pregnancy. In both respects, they implicate core constitutional values. This verity is evidenced by the fact that two of the three Courts of Appeals that have entertained challenges to the regulations have invalidated them on constitutional grounds. See *Massachusetts* v. *Secretary of Health and Human Services*, 899 F. 2d 53 (CA1 1990); *Planned Parenthood Federation of America* v. *Sullivan*, 913 F. 2d 1492 (CA10 1990).

A divided panel of the Tenth Circuit found the regulations to "fal[l] squarely within the prohibition in *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 [(1986)], and *City of Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416 [(1983)], against state intrusion into the advice a woman requests from or is given by her doctor." *Id.*, at 1501. The First Circuit, en banc with one judge dissenting, found the regulations to violate both the privacy rights of Title X patients and the First Amendment rights of Title X grantees. See also 889 F. 2d 401, 415 (CA2 1989) (Kearse, J., dissenting in part). That a bare majority of this Court today reaches a different result does not change the fact that the constitutional questions raised by the regulations are both grave and doubtful.

Nor is this a situation in which the statutory language itself requires us to address a constitutional question. Section 1008 of the Public Health Service Act, 84 Stat. 1508, 42 U. S. C. § 300a–6, provides simply: "None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." The majority concedes that this language "does not speak directly to the issues of counseling, referral, advocacy, or program integrity," *ante*, at 184, and that "the legislative history is ambiguous" in this respect. *Ante*, at 186. Consequently, the language of § 1008 easily sustains a constitutionally trouble-free interpretation.[1]

---

[1] The majority states: "There is no question but that the statutory prohibition contained in § 1008 is constitutional." *Ante*, at 192. This statement simply begs the question. Were the Court to read § 1008 to prohibit only the actual performance of abortions with Title X funds—as, indeed, the Secretary did until February 2, 1988, see 53 Fed. Reg. 2923 (1988)—the provision would fall within the category of restrictions that the Court upheld in *Harris* v. *McRae*, 448 U. S. 297 (1980), and *Maher* v. *Roe*, 432 U. S. 464 (1977). By interpreting the statute to authorize the regulation of abortion-related speech between physician and patient, however, the Secretary, and now the Court, have rejected a constitutionally sound construction in favor of one that is by no means clearly constitutional.

Thus, this is not a situation in which "the intention of Congress is revealed too distinctly to permit us to ignore it because of mere misgivings as to power." *George Moore Ice Cream Co.* v. *Rose*, 289 U. S. 373, 379 (1933). Indeed, it would appear that our duty to avoid passing unnecessarily upon important constitutional questions is strongest where, as here, the language of the statute is decidedly ambiguous. It is both logical and eminently prudent to assume that when Congress intends to press the limits of constitutionality in its enactments, it will express that intent in explicit and unambiguous terms. See Sunstein, Law and Administration After *Chevron*, 90 Colum. L. Rev. 2071, 2113 (1990) ("It is thus implausible that, after *Chevron*, agency interpretations of ambiguous statutes will prevail even if the consequence of those interpretations is to produce invalidity or to raise serious constitutional doubts").

Because I conclude that a plainly constitutional construction of § 1008 "is not only 'fairly possible' but entirely reasonable," *Machinists*, 367 U. S., at 750, I would reverse the judgment of the Court of Appeals on this ground without deciding the constitutionality of the Secretary's regulations.

## II

I also strongly disagree with the majority's disposition of petitioners' constitutional claims, and because I feel that a response thereto is indicated, I move on to that issue.

## A

Until today, the Court never has upheld viewpoint-based suppression of speech simply because that suppression was a condition upon the acceptance of public funds. Whatever may be the Government's power to condition the receipt of its largess upon the relinquishment of constitutional rights, it surely does not extend to a condition that suppresses the recipient's cherished freedom of speech based solely upon the content or viewpoint of that speech. *Speiser* v. *Randall*, 357 U. S. 513, 518–519 (1958) ("To deny an exemption to claim-

ants who engage in certain forms of speech is in effect to penalize them for such speech. . . . The denial is 'frankly aimed at the suppression of dangerous ideas,'" quoting *American Communications Assn.* v. *Douds*, 339 U. S. 382, 402 (1950)). See *Cammarano* v. *United States*, 358 U. S. 498, 513 (1959). See also *FCC* v. *League of Women Voters of Cal.*, 468 U. S. 364, 407 (1984) (REHNQUIST, J., dissenting). Cf. *Arkansas Writers' Project, Inc.* v. *Ragland*, 481 U. S. 221, 237 (1987) (SCALIA, J., dissenting). This rule is a sound one, for, as the Court often has noted: "'A regulation of speech that is motivated by nothing more than a desire to curtail expression of a particular point of view on controversial issues of general interest is the purest example of a "law . . . abridging the freedom of speech, or of the press."'" *League of Women Voters*, 468 U. S., at 383–384, quoting *Consolidated Edison Co. of N. Y.* v. *Public Service Comm'n of N. Y.*, 447 U. S. 530, 546 (1980) (STEVENS, J., concurring in judgment). "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972).

Nothing in the Court's opinion in *Regan* v. *Taxation with Representation of Washington*, 461 U. S. 540 (1983), can be said to challenge this long-settled understanding. In *Regan*, the Court upheld a content-neutral provision of the Internal Revenue Code, 26 U. S. C. § 501(c)(3), that disallowed a particular tax-exempt status to organizations that "attempt[ed] to influence legislation," while affording such status to veteran's organizations irrespective of their lobbying activities. Finding the case controlled by *Cammarano, supra*, the Court explained: "The case would be different if Congress were to discriminate invidiously in its subsidies in such a way as to '"ai[m] at the suppression of dangerous ideas."' . . . We find no indication that the statute was intended to suppress any ideas or any demonstration that it has had that effect." 461 U. S., at 548, quoting *Cammarano*, 358 U. S., at

513, in turn quoting *Speiser*, 357 U. S., at 519. The separate concurrence in *Regan* joined the Court's opinion precisely "[b]ecause 26 U. S. C. § 501's discrimination between veterans' organizations and charitable organizations is not based on the content of their speech." 461 U. S., at 551.

It cannot seriously be disputed that the counseling and referral provisions at issue in the present cases constitute content-based regulation of speech. Title X grantees may provide counseling and referral regarding any of a wide range of family planning and other topics, save abortion. Cf. *Consolidated Edison Co.*, 447 U. S., at 537 ("The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic"); *Boos* v. *Barry*, 485 U. S. 312, 319 (1988) (opinion of O'CONNOR, J.) (same).

The regulations are also clearly viewpoint based. While suppressing speech favorable to abortion with one hand, the Secretary compels antiabortion speech with the other. For example, the Department of Health and Human Services' own description of the regulations makes plain that "Title X projects are *required* to facilitate access to prenatal care and social services, including adoption services, that might be needed by the pregnant client to promote her well-being and that of her child, while making it abundantly clear that the project is not permitted to promote abortion by facilitating access to abortion through the referral process." 53 Fed. Reg. 2927 (1988) (emphasis added).

Moreover, the regulations command that a project refer for prenatal care each woman diagnosed as pregnant, irrespective of the woman's expressed desire to continue or terminate her pregnancy. 42 CFR § 59.8(a)(2) (1990). If a client asks directly about abortion, a Title X physician or counselor is required to say, in essence, that the project does not consider abortion to be an appropriate method of family planning. § 59.8(b)(4). Both requirements are antithetical to

the First Amendment.    See *Wooley* v. *Maynard*, 430 U. S. 705, 714 (1977).

The regulations pertaining to "advocacy" are even more explicitly viewpoint based.    These provide: "A Title X project may not *encourage, promote or advocate* abortion as a method of family planning."    § 59.10 (emphasis added). They explain: "This requirement prohibits actions *to assist* women to obtain abortions or *increase* the availability or accessibility of abortion for family planning purposes." § 59.10(a) (emphasis added).    The regulations do not, however, proscribe or even regulate antiabortion advocacy. These are clearly restrictions aimed at the suppression of "dangerous ideas."

Remarkably, the majority concludes that "the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Ante*, at 193.    But the majority's claim that the regulations merely limit a Title X project's speech to preventive or preconceptional services, *ibid.*, rings hollow in light of the broad range of nonpreventive services that the regulations authorize Title X projects to provide.[2]    By refusing to fund those family-planning projects that advocate abortion *because* they advocate abortion, the Government plainly has targeted a particular viewpoint.    Cf. *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989).    The majority's reliance on the fact that the regulations pertain solely to funding decisions simply begs the question.    Clearly, there are some bases upon which government may not rest its decision to fund or not to fund.    For example, the Members of the majority surely would agree that government may not base its

---

[2] In addition to requiring referral for prenatal care and adoption services, the regulations permit general health services such as physical examinations, screening for breast cancer, treatment of gynecological problems, and treatment for sexually transmitted diseases.    53 Fed. Reg. 2927 (1988).    None of the latter are strictly preventive, preconceptional services.

decision to support an activity upon considerations of race. See, *e. g., Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886). As demonstrated above, our cases make clear that ideological viewpoint is a similarly repugnant ground upon which to base funding decisions.

The majority's reliance upon *Regan* in this connection is also misplaced. That case stands for the proposition that government has no obligation to subsidize a private party's efforts to petition the legislature regarding its views. Thus, if the challenged regulations were confined to nonideological limitations upon the use of Title X funds for lobbying activities, there would exist no violation of the First Amendment. The advocacy regulations at issue here, however, are not limited to lobbying but extend to all speech having the effect of encouraging, promoting, or advocating abortion as a method of family planning. 42 CFR § 59.10(a) (1990). Thus, in addition to their impermissible focus upon the viewpoint of regulated speech, the provisions intrude upon a wide range of communicative conduct, including the very words spoken to a woman by her physician. By manipulating the content of the doctor-patient dialogue, the regulations upheld today force each of the petitioners "to be an instrument for fostering public adherence to an ideological point of view [he or she] finds unacceptable." *Wooley* v. *Maynard*, 430 U. S., at 715. This type of intrusive, ideologically based regulation of speech goes far beyond the narrow lobbying limitations approved in *Regan* and cannot be justified simply because it is a condition upon the receipt of a governmental benefit.[3]

---

[3] The majority attempts to obscure the breadth of its decision through its curious contention that "the Title X program regulations do not significantly impinge upon the doctor-patient relationship." *Ante*, at 200. That the doctor-patient relationship is substantially burdened by a rule prohibiting the dissemination by the physician of pertinent medical information is beyond serious dispute. This burden is undiminished by the fact that the relationship at issue here is not an "all-encompassing" one. A woman seeking the services of a Title X clinic has every reason to expect, as do we all, that her physician will not withhold relevant information regarding the

## B

The Court concludes that the challenged regulations do not violate the First Amendment rights of Title X staff members because any limitation of the employees' freedom of expression is simply a consequence of their decision to accept employment at a federally funded project. *Ante,* at 198–199. But it has never been sufficient to justify an otherwise unconstitutional condition upon public employment that the employee may escape the condition by relinquishing his or her job. It is beyond question "that a government may not require an individual to relinquish rights guaranteed him by the First Amendment as a condition of public employment." *Abood* v. *Detroit Bd. of Ed.,* 431 U. S. 209, 234 (1977), citing *Elrod* v. *Burns,* 427 U. S. 347, 357–360 (1976), and cases cited therein; *Perry* v. *Sindermann,* 408 U. S. 593 (1972); *Keyishian* v. *Board of Regents, State Univ. of N. Y.,* 385 U. S. 589 (1967). Nearly two decades ago, it was said:

> "For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a

---

very purpose of her visit. To suggest otherwise is to engage in uninformed fantasy. Further, to hold that the doctor-patient relationship is somehow incomplete where a patient lacks the resources to seek comprehensive health care from a single provider is to ignore the situation of a vast number of Americans. As JUSTICE MARSHALL has noted in a different context: "It is perfectly proper for judges to disagree about what the Constitution requires. But it is disgraceful for an interpretation of the Constitution to be premised upon unfounded assumptions about how people live." *United States* v. *Kras,* 409 U. S. 434, 460 (1973) (dissenting opinion).

person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" *Perry* v. *Sindermann*, 408 U. S., at 597, quoting *Speiser* v. *Randall*, 357 U. S., at 526.

The majority attempts to circumvent this principle by emphasizing that Title X physicians and counselors "remain free . . . to pursue abortion-related activities when they are not acting under the auspices of the Title X project." *Ante*, at 198. "The regulations," the majority explains, "do not in any way restrict the activities of those persons acting as private individuals." *Ante*, at 198, 199. Under the majority's reasoning, the First Amendment could be read to tolerate *any* governmental restriction upon an employee's speech so long as that restriction is limited to the funded workplace. This is a dangerous proposition, and one the Court has rightly rejected in the past.

In *Abood*, it was no answer to the petitioners' claim of compelled speech as a condition upon public employment that their speech outside the workplace remained unregulated by the State. Nor was the public employee's First Amendment claim in *Rankin* v. *McPherson*, 483 U. S. 378 (1987), derogated because the communication that her employer sought to punish occurred during business hours. At the least, such conditions require courts to balance the speaker's interest in the message against those of government in preventing its dissemination. *Id.*, at 384; *Pickering* v. *Board of Ed. of Township High School Dist.*, 391 U. S. 563, 568 (1968).

In the cases at bar, the speaker's interest in the communication is both clear and vital. In addressing the family-planning needs of their clients, the physicians and counselors who staff Title X projects seek to provide them with the full range of information and options regarding their health and reproductive freedom. Indeed, the legitimate expectations

of the patient and the ethical responsibilities of the medical profession demand no less. "The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. . . . The physician has an ethical obligation to help the patient make choices from among the therapeutic alternatives consistent with good medical practice." Current Opinions of Council on Ethical and Judicial Affairs of American Medical Association ¶ 8.08 (1989). See also President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Making Health Care Decisions 70 (1982); American College of Obstetricians & Gynecologists, Standards for Obstetric-Gynecologic Services 62 (7th ed. 1989). When a client becomes pregnant, the full range of therapeutic alternatives includes the abortion option, and Title X counselors' interest in providing this information is compelling.

The Government's articulated interest in distorting the doctor-patient dialogue—ensuring that federal funds are not spent for a purpose outside the scope of the program—falls far short of that necessary to justify the suppression of truthful information and professional medical opinion regarding constitutionally protected conduct.[4] Moreover, the offending regulation is not narrowly tailored to serve this interest. For example, the governmental interest at stake could be served by imposing rigorous bookkeeping standards to ensure financial separation or adopting content-neutral rules for the balanced dissemination of family-planning and health information. See *Massachusetts* v. *Secretary of Health and Human Services*, 899 F. 2d 53, 74 (CA1 1990), cert. pending, No. 89–1929. By failing to balance or even to consider the free speech interests claimed by Title X physicians against the Government's asserted interest in suppressing the speech, the Court falters in its duty to implement the protec-

---

[4] It is to be noted that the Secretary has made no claim that the regulations at issue reflect any concern for the health or welfare of Title X clients.

tion that the First Amendment clearly provides for this important message.

## C

Finally, it is of no small significance that the speech the Secretary would suppress is truthful information regarding constitutionally protected conduct of vital importance to the listener. One can imagine no legitimate governmental interest that might be served by suppressing such information. Concededly, the abortion debate is among the most divisive and contentious issues that our Nation has faced in recent years. "But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943).

## III

By far the most disturbing aspect of today's ruling is the effect it will have on the Fifth Amendment rights of the women who, supposedly, are beneficiaries of Title X programs. The majority rejects petitioners' Fifth Amendment claims summarily. It relies primarily upon the decisions in *Harris* v. *McRae*, 448 U. S. 297 (1980), and *Webster* v. *Reproductive Health Services*, 492 U. S. 490 (1989). There were dissents in those cases, and we continue to believe that they were wrongly and unfortunately decided. Be that as it may, even if one accepts as valid the Court's theorizing in those cases, the majority's reasoning in the present cases is flawed.

Until today, the Court has allowed to stand only those restrictions upon reproductive freedom that, while limiting the availability of abortion, have left intact a woman's ability to decide without coercion whether she will continue her pregnancy to term. *Maher* v. *Roe*. 432 U. S. 464 (1977), *McRae*, and *Webster* are all to this effect. Today's decision abandons that principle, and with disastrous results.

Contrary to the majority's characterization, this is not a situation in which individuals seek Government aid in exercising their fundamental rights. The Fifth Amendment right asserted by petitioners is the right of a pregnant woman to be free from affirmative governmental *interference* in her decision. *Roe* v. *Wade*, 410 U. S. 113 (1973), and its progeny are not so much about a medical procedure as they are about a woman's fundamental right to self-determination. Those cases serve to vindicate the idea that "liberty," if it means anything, must entail freedom from governmental domination in making the most intimate and personal of decisions. See, *e. g., Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 444 (1983) (governmental interest in ensuring that pregnant women receive medically relevant information "will not justify abortion regulations designed to influence the woman's informed choice between abortion or childbirth"); *Maher* v. *Roe*, 432 U. S., at 473 (noting that the Court's abortion cases "recognize a constitutionally protected interest 'in making certain kinds of important decisions' free from governmental compulsion," quoting *Whalen* v. *Roe*, 429 U. S. 589, 599 (1977)); see also *Harris* v. *McRae*, 448 U. S., at 312; *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747, 759 (1986); *Roe* v. *Wade*, 410 U. S., at 169–170 (Stewart, J., concurring). By suppressing medically pertinent information and injecting a restrictive ideological message unrelated to considerations of maternal health, the Government places formidable obstacles in the path of Title X clients' freedom of choice and thereby violates their Fifth Amendment rights.

It is crystal clear that the aim of the challenged provisions—an aim the majority cannot escape noticing—is not simply to ensure that federal funds are not used to perform abortions, but to "reduce the incidence of abortion." 42 CFR § 59.2 (1990) (in definition of "family planning"). As recounted above, the regulations require Title X physicians and counselors to provide information pertaining only to child-

birth, to refer a pregnant woman for prenatal care irrespective of her medical situation, and, upon direct inquiry, to respond that abortion is not an "appropriate method" of family planning.

The undeniable message conveyed by this forced speech, and the one that the Title X client will draw from it, is that abortion nearly always is an improper medical option. Although her physician's words, in fact, are strictly controlled by the Government and wholly unrelated to her particular medical situation, the Title X client will reasonably construe them as professional advice to forgo her right to obtain an abortion. As would most rational patients, many of these women will follow that perceived advice and carry their pregnancy to term, despite their needs to the contrary and despite the safety of the abortion procedure for the vast majority of them. Others, delayed by the regulations' mandatory prenatal referral, will be prevented from acquiring abortions during the period in which the process is medically sound and constitutionally protected.

In view of the inevitable effect of the regulations, the majority's conclusion that "[t]he difficulty that a woman encounters when a Title X project does not provide abortion counseling or referral leaves her in no different position than she would have been if the Government had not enacted Title X," *ante*, at 202, is insensitive and contrary to common human experience. Both the purpose and result of the challenged regulations are to deny women the ability voluntarily to decide their procreative destiny. For these women, the Government will have obliterated the freedom to choose as surely as if it had banned abortions outright. The denial of this freedom is not a consequence of poverty but of the Government's ill-intentioned distortion of information it has chosen to provide.[5]

---

[5] In the context of common-law tort liability, commentators have recognized: "If there is no duty to go to the assistance of a person in difficulty or peril, there is at least a duty to avoid any affirmative acts which make his

The substantial obstacles to bodily self-determination that the regulations impose are doubly offensive because they are effected by manipulating the very words spoken by physicians and counselors to their patients. In our society, the doctor-patient dialogue embodies a unique relationship of trust. The specialized nature of medical science and the emotional distress often attendant to health-related decisions requires that patients place their complete confidence, and often their very lives, in the hands of medical professionals. One seeks a physician's aid not only for medication or diagnosis, but also for guidance, professional judgment, and vital emotional support. Accordingly, each of us attaches profound importance and authority to the words of advice spoken by the physician.

It is for this reason that we have guarded so jealously the doctor-patient dialogue from governmental intrusion. "[I]n *Roe* and subsequent cases we have 'stressed repeatedly the central role of the physician, both in consulting with the woman about whether or not to have an abortion, and in determining how any abortion was to be carried out.'" *Akron,* 462 U. S., at 447, quoting *Colautti* v. *Franklin,* 439 U. S. 379, 387 (1979). See also *Thornburgh,* 476 U. S., at 763. The majority's approval of the Secretary's regulations flies in the face of our repeated warnings that regulations tending to "confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession," cannot endure. *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52, 67, n. 8 (1976).

The majority attempts to distinguish our holdings in *Akron* and *Thornburgh* on the *post hoc* basis that the governmental

---

situation worse. . . . The same is true, of course, of a physician who accepts a charity patient. Such a defendant will then be liable for a failure to use reasonable care for the protection of the plaintiff's interests." W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 56, p. 378 (5th ed. 1984) (footnotes omitted). This observation seems equally appropriate to the cases at bar.

intrusions into the doctor-patient dialogue invalidated in those cases applied to *all* physicians within a jurisdiction while the regulations now before the Court pertain to the narrow class of health care professionals employed at Title X projects. *Ante,* at 202. But the rights protected by the Constitution are *personal* rights. *Loving* v. *Virginia,* 388 U. S. 1, 12 (1967); *Shelley* v. *Kraemer,* 334 U. S. 1, 22 (1948). And for the individual woman, the deprivation of liberty by the Government is no less substantial because it affects few rather than many. It cannot be that an otherwise unconstitutional infringement of choice is made lawful because it touches only some of the Nation's pregnant women and not all of them.

The manipulation of the doctor-patient dialogue achieved through the Secretary's regulations is clearly an effort "to deter a woman from making a decision that, with her physician, is hers to make." *Thornburgh,* 476 U. S., at 759. As such, it violates the Fifth Amendment.[6]

## IV

In its haste further to restrict the right of every woman to control her reproductive freedom and bodily integrity, the majority disregards established principles of law and contorts this Court's decided cases to arrive at its preordained result. The majority professes to leave undisturbed the free speech protections upon which our society has come to rely, but one must wonder what force the First Amendment retains if it is read to countenance the deliberate manipulation by the Gov-

---

[6] Significantly, the Court interprets the challenged regulations to allow a Title X project to refer a woman whose health would be seriously endangered by continued pregnancy to an abortion provider. *Ante,* at 195. To hold otherwise would be to adopt an interpretation that would most certainly violate a patient's right to substantive due process. See, *e. g., Youngberg* v. *Romeo,* 457 U. S. 307 (1982); *Revere* v. *Massachusetts General Hospital,* 463 U. S. 239 (1983). The Solicitor General at oral argument, however, afforded the regulations a far less charitable interpretation. See Tr. of Oral Arg. 44–47.

ernment of the dialogue between a woman and her physician, While technically leaving intact the fundamental right protected by *Roe* v. *Wade,* the Court, "through a relentlessly formalistic catechism," *McRae,* 448 U. S., at 341 (MARSHALL, J., dissenting), once again has rendered the right's substance nugatory.   See *Webster* v. *Reproductive Health Services,* 492 U. S., at 537, 560 (opinions concurring in part and dissenting in part).   This is a course nearly as noxious as overruling *Roe* directly, for if a right is found to be unenforceable, even against flagrant attempts by government to circumvent it, then it ceases to be a right at all.   This, I fear, may be the effect of today's decision.

JUSTICE STEVENS, dissenting.

In my opinion, the Court has not paid sufficient attention to the language of the controlling statute or to the consistent interpretation accorded the statute by the responsible cabinet officers during four different Presidencies and 18 years.

The relevant text of the "Family Planning Services and Population Research Act of 1970" has remained unchanged since its enactment.   84 Stat. 1504.   The preamble to the Act states that it was passed:

> "To promote public health and welfare by expanding, improving, and better coordinating the family planning services and population research activities of the Federal Government, and for other purposes."   *Ibid.*

The declaration of congressional purposes emphasizes the importance of educating the public about family planning services.   Thus, § 2 of the Act states, in part, that the purpose of the Act is:

> "(1)  to assist in making comprehensive voluntary family planning services readily available to all persons desiring such services;
>
> .       :          .          .          .
>
> "(5)  to develop and make readily available information (including educational materials) on family planning and

population growth to all persons desiring such information." 42 U. S. C. § 300 (Congressional Declaration of Purpose).

In contrast to the statutory emphasis on making relevant information readily available to the public, the statute contains no suggestion that Congress intended to authorize the suppression or censorship of any information by any Government employee or by any grant recipient.

Section 6 of the Act authorizes the provision of federal funds to support the establishment and operation of voluntary family planning projects. The section also empowers the Secretary to promulgate regulations imposing conditions on grant recipients to ensure that "such grants will be effectively utilized for the purposes for which made." § 300a–4(b). Not a word in the statute, however, authorizes the Secretary to impose any restrictions on the dissemination of truthful information or professional advice by grant recipients.

The word "prohibition" is used only once in the Act. Section 6, which adds to the Public Health Service Act the new Title X, covering the subject of population research and voluntary planning programs, includes the following provision:

"PROHIBITION OF ABORTION
"Sec. 1008. None of the funds appropriated under this title shall be used in programs where abortion is a method of family planning." 84 Stat. 1508, 42 U. S. C. § 300a–6.

Read in the context of the entire statute, this prohibition is plainly directed at conduct, rather than the dissemination of information or advice, by potential grant recipients.

The original regulations promulgated in 1971 by the Secretary of Health, Education, and Welfare so interpreted the statute. This "'contemporaneous construction of [the] statute by the men charged with the responsibility of setting its machinery in motion'" is entitled to particular respect. See *Power Reactor Development Co.* v. *Electrical Workers,* 367

U. S. 396, 408 (1961); *Udall* v. *Tallman*, 380 U. S. 1, 16
(1965); *Aluminum Co. of America* v. *Central Lincoln Peoples' Utility Dist.*, 467 U. S. 380, 390 (1984).   The regulations described the kind of services that grant recipients had
to provide in order to be eligible for federal funding, but
they did not purport to regulate or restrict the kinds of advice or information that recipients might make available to
their clients.   Conforming to the language of the governing
statute, the regulations provided that "[t]he project will not
*provide* abortions as a method of family planning."   42 CFR
§ 59.5(a)(9) (1972) (emphasis added).   Like the statute itself,
the regulations prohibited conduct, not speech.

The same is true of the regulations promulgated in 1986 by
the Secretary of Health and Human Services.   They also
prohibited grant recipients from performing abortions but
did not purport to censor or mandate any kind of speech.
See 42 CFR §§ 59.1–59.13 (1986).

The entirely new approach adopted by the Secretary in
1988 was not, in my view, authorized by the statute.   The
new regulations did not merely reflect a change in a policy
determination that the Secretary had been authorized by
Congress to make.   Cf. *Chevron U. S. A. Inc.* v. *Natural
Resources Defense Council, Inc.*, 467 U. S. 837, 865 (1984).
Rather, they represented an assumption of policymaking
responsibility that Congress had not delegated to the Secretary.   See *id.*, at 842–843 ("If the intent of Congress is clear,
that is the end of the matter; for the court, as well as the
agency, must give effect to the unambiguously expressed intent of Congress").   In a society that abhors censorship and
in which policymakers have traditionally placed the highest
value on the freedom to communicate, it is unrealistic to conclude that statutory authority to regulate conduct implicitly
authorized the Executive to regulate speech.

Because I am convinced that the 1970 Act did not authorize
the Secretary to censor the speech of grant recipients or their

employees, I would hold the challenged regulations invalid and reverse the judgment of the Court of Appeals.

Even if I thought the statute were ambiguous, however, I would reach the same result for the reasons stated in JUSTICE O'CONNOR's dissenting opinion. As she also explains, if a majority of the Court had reached this result, it would be improper to comment on the constitutional issues that the parties have debated. Because the majority has reached out to decide the constitutional questions, however, I am persuaded that JUSTICE BLACKMUN is correct in concluding that the majority's arguments merit a response. I am also persuaded that JUSTICE BLACKMUN has correctly analyzed these issues. I have therefore joined Parts II and III of his opinion.

JUSTICE O'CONNOR, dissenting.

"[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). JUSTICE BLACKMUN has explained well why this longstanding canon of statutory construction applies in these cases, and I join Part I of his dissent. Part II demonstrates why the challenged regulations, which constitute the Secretary's interpretation of § 1008 of the Public Health Service Act, 84 Stat. 1508, 42 U. S. C. § 300a–6, "raise serious constitutional problems": the regulations place content-based restrictions on the speech of Title X fund recipients, restrictions directed precisely at speech concerning one of "the most divisive and contentious issues that our Nation has faced in recent years." *Ante*, at 215.

One may well conclude, as JUSTICE BLACKMUN does in Part II, that the regulations are unconstitutional for this reason. I do not join Part II of the dissent, however, for the same reason that I do not join Part III, in which JUS-

TICE BLACKMUN concludes that the regulations are unconstitutional under the Fifth Amendment. The canon of construction that JUSTICE BLACKMUN correctly applies here is grounded in large part upon our time-honored practice of not reaching constitutional questions unnecessarily. See *DeBartolo, supra,* at 575. "It is a fundamental rule of judicial restraint . . . that this Court will not reach constitutional questions in advance of the necessity of deciding them." *Three Affiliated Tribes of Fort Berthold Reservation* v. *Wold Engineering, P. C.,* 467 U. S. 138, 157 (1984). See also *Alexander* v. *Louisiana,* 405 U. S. 625, 633 (1972); *Burton* v. *United States,* 196 U. S. 283, 295 (1905); *Liverpool, New York & Philadelphia S. S. Co.* v. *Commissioners of Emigration,* 113 U. S. 33, 39 (1885) (In the exercise of its jurisdiction to pronounce unconstitutional laws of the United States, this Court "has rigidly adhered" to the rule "never to anticipate a question of constitutional law in advance of the necessity of deciding it").

This Court acts at the limits of its power when it invalidates a law on constitutional grounds. In recognition of our place in the constitutional scheme, we must act with "great gravity and delicacy" when telling a coordinate branch that its actions are absolutely prohibited absent constitutional amendment. *Adkins* v. *Children's Hospital of District of Columbia,* 261 U. S. 525, 544 (1923). See also *Blodgett* v. *Holden,* 275 U. S. 142, 147–148 (1927) (Holmes, J., concurring). In these cases, we need only tell the Secretary that his regulations are not a reasonable interpretation of the statute; we need not tell Congress that it cannot pass such legislation. If we rule solely on statutory grounds, Congress retains the power to force the constitutional question by legislating more explicitly. It may instead choose to do nothing. That decision should be left to Congress; we should not tell Congress what it cannot do before it has chosen to do it. It is enough in this litigation to conclude that neither the language nor the history of § 1008 compels the Secretary's in-

terpretation, and that the interpretation raises serious First Amendment concerns.   On this basis alone, I would reverse the judgment of the Court of Appeals and invalidate the challenged regulations.