# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 25, 2013          Decided January 17, 2014

No. 12-5379

ERIK O. AUTOR, ET AL.,
APPELLANTS

v.

PENNY SUE PRITZKER, IN HER OFFICIAL CAPACITY AS
SECRETARY OF COMMERCE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-01593)

*Charles A. Rothfeld* argued the cause and filed the briefs for appellants. With him on the briefs was *Joseph P. Minta*.

*Michael S. Raab*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, *Mark B. Stern* and *Daniel Tenny*, Attorneys.

Before: TATEL and BROWN, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: President Obama, seeking to reduce the "culture of special interest access," directed executive agency heads to bar federally registered lobbyists from serving on advisory committees. Appellants, federally registered lobbyists wishing appointment to one type of advisory committee—Industry Trade Advisory Committees (ITACs)—challenge the constitutionality of the presidential ban. Because the ban requires Appellants to limit their exercise of a constitutional right—in this case, the First Amendment right to petition government—in order to qualify for a governmental benefit—in this case, ITAC membership—we reverse the district court's premature dismissal of the complaint and remand for that court to determine in the first instance whether the government's interest in excluding federally registered lobbyists from ITACs outweighs any impingement on Appellants' constitutional rights.

## I.

Created by the Trade Act of 1974, which requires the President to "seek information and advice from representative elements of the private sector . . . with respect to" trade policy, 19 U.S.C. § 2155(a)(1), ITACs play a significant role in shaping international trade agreements. *See id.* § 2155(c)(2). The sixteen industry-specific ITACs run the gamut of industrial interests from Aerospace Equipment to Consumer Goods to Service and Financial Industries. *See* International Trade Administration, *List of Industry Trade Advisory Committees*, available at www.ita.doc.gov/itac/committees/index.asp (last visited Jan. 10, 2014). In addition to meeting "at the call of the United States Trade Representative," 19 U.S.C. § 2155(d), ITACs prepare reports for the President, Congress, and the Trade Representative on whether proposed trade agreements provide for "equity and reciprocity within" the committees' sector, *id.*

§ 2155(e)(1), (3). Although ITAC advice is non-binding, the Act requires the Trade Representative to "inform the advisory committees of significant departures from such advice or recommendations made." *Id.* § 2155(i)(2).

Unlike many advisory committees, ITACs exist for the very purpose of reflecting the viewpoints of private industry. According to the Trade Act, the "committees shall, insofar as is practicable, be representative of all industry, labor, agricultural, or service interests." *Id.* § 2155(c)(2). Applicants for ITAC membership must be sponsored by a firm or organization engaged in trade or trade policy. *See* Request for Nominations for the Industry Trade Advisory Committees (ITACs), 75 Fed. Reg. 24,584, 24,585 (May 5, 2010). ITAC members serve in a "representative capacity presenting the views and interests of a U.S. entity or U.S. organization." *Id*. It should thus come as no surprise that the Aerospace Equipment ITAC includes representatives of Boeing, Pratt & Whitney, Gulfstream, General Electric, Lockheed Martin, and Bell Aerospace. Likewise, the Energy and Energy Services ITAC includes representatives of Halliburton, Chevron, General Electric, the National Mining Association, and the Nuclear Energy Institute. *See* International Trade Administration, *List of Industry Trade Advisory Committees*, available at www.ita.doc.gov/itac/committees/index.asp (last visited Jan. 10, 2014).

Although Congress created ITACs to represent the views of the private sector, President Obama directed "the heads of executive departments and agencies not to make any new appointments or reappointments of federally registered lobbyists to advisory committees." Presidential Memorandum, Lobbyists on Agency Boards and Commissions, 75 Fed. Reg. 35,955 (June 18, 2010). In so directing, the President sought to further his commitment to change "the culture of

special-interest access" that is furthered by lobbyists' "service in privileged positions within the executive branch." *Id.* "My administration," the President explained, "is committed to reducing the undue influence of special interests that for too long has shaped the national agenda and drowned out the voices of ordinary Americans." *Id.* Pursuant to the President's directive, and setting the stage for this litigation, the Commerce Secretary and the Trade Representative prohibit federally registered lobbyists from serving on ITACs. *See* Request for Nominations for the Industry Trade Advisory Committees (ITACs), 75 Fed. Reg. at 24,585.

Contrary to popular belief, only certain lobbyists are required to be federally registered. The Lobbying Disclosure Act of 1995 (LDA) requires that lobbyists register if they (1) are employed by a client for compensation, (2) have made more than one lobbying contact on behalf of such client, and (3) have spent at least twenty percent of their time for that client working on lobbying activities during a three-month period. 2 U.S.C. § 1602(10). In other words, lobbyists have no obligation to register if they limit their lobbying activities to at most twenty percent of their time working for any particular client.

Appellants, six federally registered lobbyists wishing to serve on ITACs, sued to enjoin the ban. Relying on *Perry v. Sindermann*, 408 U.S. 593 (1972), which limits the government's power to condition governmental benefits on recipients' relinquishment of constitutionally protected rights, Appellants alleged that the ban violates the First Amendment and the equal protection guarantee of the Fifth Amendment by "denying the benefit of committee service to individuals whose exercise of the right to petition triggers the LDA's registration requirement." Complaint ¶ 44.

The district court dismissed the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The court first found Appellants' claims foreclosed by *Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984), in which the Supreme Court held that "the Constitution does not grant members of the public any particular right to be heard by public bodies making policy decisions." *Autor v. Blank*, 892 F. Supp. 2d 264, 273–74 (D.D.C. 2012) (citing *Knight*, 465 U.S. at 283). The court went on to conclude that even if *Knight* left open Appellants' unconstitutional conditions claim, the complaint nonetheless failed to establish both "that service on an ITAC is a valuable government benefit," *id.* at 275, and that Appellants were denied this benefit "on a basis that infringes upon their constitutionally protected rights," *id.* at 268. Finding that the lobbyist ban implicated no fundamental rights, the court also rejected Appellants' Fifth Amendment equal protection claim. *See id.* at 282–84.

On appeal, Appellants challenge the dismissal of both their First Amendment and Fifth Amendment claims. We review Rule 12(b)(6) dismissals de novo, *see St. Marks Place Housing Co., Inc. v. U.S. Department of Housing & Urban Development*, 610 F.3d 75, 79 (D.C. Cir. 2010), "accept[ing] as true all of the factual allegations contained in the complaint and draw[ing] all inferences in favor of the nonmoving party," *City of Harper Woods Employees' Retirement System v. Olver*, 589 F.3d 1292, 1298 (D.C. Cir. 2009).

## II.

At the outset, we think it important to put the issue before us in its proper context. Reading the government's brief and listening to oral argument, during which counsel asserted that the Constitution imposes "very, very few restrictions" on the "President's [power to] choos[e] [his] advisors," Oral Arg. Tr. 16, one might get the impression that this case is about the

President's ability to select his Chief of Staff or White House Counsel. Nothing could be further from the truth. The question before us concerns only the President's choice of individuals to serve on congressionally created advisory committees—more specifically, Industry Trade Advisory Committees.

According to Appellants, we may resolve this case through a straightforward application of *Perry*'s "unconstitutional conditions" doctrine. *See Perry*, 408 U.S. at 597. If, as they allege, ITAC service qualifies as a governmental benefit and the registered-lobbyist ban requires them to curtail their right to petition government to receive this benefit, then, they contend, the government has unconstitutionally burdened their exercise of this right. Before addressing this question, however, we must consider the government's antecedent argument, embraced by the district court, that the Supreme Court's recognition in *Knight* of the government's freedom to choose its advisors forecloses application of the unconstitutional conditions doctrine here.

*Knight* concerned a Minnesota law requiring public employers to "meet and confer" with their professional employees on employment-related policy issues. *Knight*, 465 U.S. at 274. But if an employee bargaining unit had an exclusive bargaining representative, i.e., a union, the law prohibited the employer from "meeting and conferring" with anyone other than the union's representatives. *Id.* at 274–75. In *Knight*, community college teachers who had declined to join their union and were therefore prohibited from "meeting and conferring" with their employer on their own challenged this provision. Although the union allowed both union and nonunion members "to nominate candidates, to run for election, and to vote for" each "meet and confer" representative, *id.* at 280 n.5, the teachers alleged that Minnesota unconstitutionally burdened their First Amendment

rights by limiting participation in the "meet and confer" process to representatives chosen by the union, *id.* at 279.

Declining to "recognize a constitutional right to participate directly in government policymaking [that] would work a revolution in existing government practices," *id.* at 284, the Supreme Court rejected the teachers' "principal claim . . . that they ha[d] a right to force officers of the State" to listen to them, *id.* at 282. "Absent statutory restrictions," the Court elaborated, "the State must be free to consult or not to consult whomever it pleases." *Id.* at 285. The Court then rejected the teachers' claim that the *union's* ability to exclude nonmembers from participation in the "meet and confer" sessions burdened nonmember teachers' speech and associational rights. The Court reasoned that the union's ability to choose "representatives who share[d] its views on the issues to be discussed with the State . . . no more unconstitutionally inhibit[ed] [the teachers'] speech than voters' power to reject a candidate for office inhibits the candidate's speech," *id.* at 289, and that any pressure the teachers might have felt to join the union was constitutionally insignificant because it was the same pressure any individual feels to join a privileged group, *id.* at 289–90.

The government argues that *Knight* controls this case. Like the state in *Knight*, the government insists it has "simply restricted the class of persons to whom it will listen in its making of policy." Appellee's Br. 14 (quoting *Knight*, 465 U.S. at 282) (internal quotation marks omitted). Moreover, the government argues, it makes no difference if its decision pressures Appellants to limit their lobbying activities, as *Knight* found this very type of pressure constitutionally insignificant. According to the government, therefore, it violated no constitutional right when it "determin[ed] that it would make best use of the advisory committee mechanism by

receiving information and advice from persons who are not already paid to regularly share their views with federal officials." Appellee's Br. 14–15.

*Knight* does not control this case. Acknowledging they have no constitutional right to make the government listen to them, Appellants argue that the government—required by the Trade Act to establish ITACs for the very purpose of hearing the views of industry—may not deny them the benefit of ITAC service based on their exercise of the constitutional right to petition government. Unlike in *Knight*, in which the alleged burden on the teachers' First Amendment rights resulted from the *union*'s exclusion of them from the "meet and confer" committees, here any burden on Appellants' constitutional rights results directly from the *government's* decision to bar them from ITAC membership. True, the state in *Knight* was indirectly responsible for the alleged burden on the teachers' constitutional rights, but as the Court explained, any indirect burden was inherent in the state's decision to listen to some but not all. *See Knight*, 465 U.S. at 289–90. Put another way, although the Supreme Court recognized that the government may choose to hear from some groups at the expense of others, it never addressed the question we face here—whether, in so doing, the government may also limit the constitutional rights of those to whom it chooses to listen.

The situation before us is more analogous to cases in which the government sought to curtail the First Amendment rights of government employees than it is to *Knight*. Although the government generally has authority to choose whom it hires, the Supreme Court has repeatedly subjected employment conditions restricting fundamental rights to constitutional scrutiny, at least when the government fills non-partisan, non-policymaking positions. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 372–73 (1976) (holding patronage dismissals of

non-policymaking public employees unconstitutional); *Pickering v. Board of Education*, 391 U.S. 563, 574–75 (1968) (holding unconstitutional city's restriction on employee speech on matter of public concern); *see also Williams v. Rhodes*, 393 U.S. 23, 29 (1968) (recognizing that although "the Constitution is filled with provisions that grant Congress or the States specific power[s] . . . these granted powers are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution"). Indeed, were the government correct about *Knight*, it would be free, as its counsel virtually conceded at oral argument, to exclude committee members based on race, gender, or political expression. Oral Arg. Tr. 14–16.

Having rejected the government's *Knight* argument, we turn to Appellants' claim that the lobbyist ban imposes an unconstitutional condition on their right to petition government. As formulated in *Perry v. Sindermann*, the unconstitutional conditions doctrine provides that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [it] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." 408 U.S. at 597. The district court dismissed this claim, finding that the ban neither deprived Appellants of a valuable benefit nor burdened their right to petition. We disagree on both counts.

As to the first issue, the government does not defend the district court's conclusion that ITAC service fails to qualify as a governmental benefit. Indeed, ITAC membership comes with many important benefits. For example, ITAC members are able to play a significant role in shaping national trade policy: they consult with top-government officials before, during, and after the conclusion of trade negotiations; they submit reports

assessing the impact of trade agreements on industry; and the Trade Representative is required to respond to these reports. *See* 19 U.S.C. § 2155(d), (e)(1),(3), (i). Also, as Appellants explained to the district court, ITAC members receive "valuable expertise," "experience," and "a resume-enhancing characteristic." *Autor*, 892 F. Supp. 2d at 276. True, as the district court pointed out, such benefits may not be quantifiable in the same way as tax exemptions, welfare payments, and other benefits the Supreme Court has found to implicate the unconstitutional conditions doctrine. *See id.* at 277. But as the district court also acknowledged, "neither the Supreme Court nor this Circuit has required the benefit in an unconstitutional conditions claim to have measurable economic worth." *Id.* at 275. This is hardly surprising given that the doctrine's foundational principle—that the government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests . . . to produce a result which (it) could not command directly," *Perry*, 408 U.S. at 597 (internal quotations omitted)—does not turn on whether the benefit has *economic* worth. Even if it has none, so long as it has value to those who seek it, as ITAC membership does to Appellants, then the government can use its power to withhold the benefit to pressure Appellants to forgo constitutionally protected activity. Our sister circuits have thus extended the doctrine to a broad range of non-monetary benefits and none, to our knowledge, has found a benefit too insignificant. *See, e.g.*, *Cuffley v. Mickes*, 208 F.3d 702, 707 (8th Cir. 2000) (participation in adopt-a-highway program); *Hyland v. Wonder*, 972 F.2d 1129, 1135–36 (9th Cir. 1992) (volunteer position).

As to the second basis for the district court's decision, the government acknowledges, as it must, that registered lobbyists are protected by the First Amendment right to petition. *See Liberty Lobby, Inc. v. Pearson*, 390 F.2d 489, 491 (D.C. Cir.

1968) (holding lobbying is protected by the right to petition government); *see also Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 801 (1988) (holding that First Amendment rights are "not lost merely because compensation is received"). Its disagreement with Appellants centers on whether the ban infringes this right. For its part, the district court concluded that the ban "does not curtail protected activity," reasoning that "the statutory duty to register is not directly correlated with the amount, nature, or content of any lobbyist's protected activity." *Autor*, 892 F. Supp. 2d at 281–82. Again, the government does not defend the district court's reasoning. Instead, it argues that the ban imposes no unconstitutional burden, citing in support *Lyng v. International Union*, 485 U.S. 360 (1988), one of a series of decisions holding that "when the government appropriates public funds to establish a program," *Rust v. Sullivan*, 500 U.S. 173, 194 (1991), its "decision not to [use program funds to] subsidize the exercise of a fundamental right does not infringe the right." *Lyng v. International Union, United Automobile, Aerospace & Agricultural Implement Workers of America*, 485 U.S. 360, 368 (1988) (quoting *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 549 (1983)) (internal quotation marks omitted). In *Lyng*, the Supreme Court held that the government could deny food stamp increases to striking workers without running afoul of the First Amendment. *Id.* at 369–73; *see also Regan*, 461 U.S. at 551 (upholding denial of tax exemption). But unlike in *Lyng* and the other subsidy cases, in which the government withheld a financial benefit from the plaintiffs, here the government pays ITAC members nothing. They serve as volunteers, absorbing even their out of pocket expenses. *See* Request for Nominations for the Industry Trade Advisory Committees (ITACs), 75 Fed. Reg. at 24,585. The Supreme Court has never extended the subsidy doctrine to situations not involving financial benefits, and the government

offers no reason, nor can we think of one, why we should do so here.

The government also cites *Lyng* for the proposition that the lobbyist ban cannot "be thought to constitute significant pressure to give up one's status as a paid registered lobbyist." Appellee's Br. 17. As Appellants point out, however, this argument is premature. In their complaint, Appellants plausibly alleged that the ban pressures them to limit their constitutional right to petition, and given that the district court dismissed the complaint pursuant to Rule 12(b)(6)—by contrast, the Supreme Court resolved *Lyng* at summary judgment—we must accept this allegation as true. *See City of Harper Woods*, 589 F.3d at 1298.

The government next argues that the availability of a "wide variety of alternative settings"—such as public meetings, hearings, and trade "road shows"—in which "registered lobbyists remain free" to participate in shaping trade policy, Appellee's Br. 18, "underscore the absence of any First Amendment concerns," Appellee's Br. 20. But as Appellants point out, their ability to participate in trade policy in a variety of other ways is no answer to their argument that banning them from ITAC membership deprives them of "an especially effective way to affect government policy." Appellants' Reply Br. 19. In support, Appellants cite—properly in our view—*Healy v. James*, 408 U.S. 169 (1972), in which the Supreme Court held that a public university's decision to deny a student organization official recognition burdened the student group notwithstanding the group's ability to associate in other ways. *See id.* at 183. The government has no answer to *Healy*.

To sum up, then, Appellants have pled a viable First Amendment unconstitutional conditions claim. That is, they

allege that the government has conditioned their eligibility for the valuable benefit of ITAC membership on their willingness to limit their First Amendment right to petition government.

But this does not end our inquiry. The Supreme Court has long sanctioned government burdens on public employees' exercise of constitutional rights "that would be plainly unconstitutional if applied to the public at large." *United States v. National Treasury Employees Union*, 513 U.S. 454, 465 (1995) (citing *Pickering*, 391 U.S. 563). Although ITAC service differs from public employment, the government's interest in selecting its advisors, *see Knight*, 465 U.S. at 285, implicates similar considerations that we believe may justify similar restrictions on individual rights. As the Supreme Court explained in *Pickering v. Board of Education*, the "problem in [these cases] is to arrive at a balance between the interests of the [individual] . . . and the interest of the State." 391 U.S. at 568. And where, as here, the government imposes a "blanket" ban on protected activity, its "burden is greater" than in an ordinary *Pickering* case. *National Treasury Employees Union*, 513 U.S. at 468.

The government justifies the ban on the grounds that it "directly relates to the purposes and efficacy of the ITACs as advisers" by "enabl[ing] the government to listen to individuals who have experience in the industry but who are not registered lobbyists, and are thus not otherwise as actively engaged in the political and administrative process." Appellee's Br. 16–17. This rationale, Appellants respond, is "barely intelligible" because ITAC members "serve in a *representative* capacity." Appellants' Reply Br. 13 (emphasis added). Appellants also urge us to undertake the *Pickering* balancing ourselves. But given that the issue is virtually unbriefed, that the district court dismissed the complaint pursuant to Rule 12(b)(6), and that the challenged ban

represents a major presidential initiative, we believe the wisest course of action is to remand for the district court to develop a factual record and undertake the *Pickering* analysis in the first instance. In so doing, the district court should ask the parties to focus on the justification for distinguishing, as the lobbyist ban does, between corporate employees (who may represent their employers on ITACs) and the registered lobbyists those same corporations retain (who may not). The court may also want to ask the government to explain how banning lobbyists from committees composed of representatives of the likes of Boeing and General Electric protects the "voices of ordinary Americans." Presidential Memorandum, 75 Fed. Reg. at 35,955.

We have one loose end to tie up. As noted at the outset, in addition to their First Amendment claim, Appellants pled a Fifth Amendment equal protection claim. Because they have plausibly alleged that the ban denies them a benefit available to others on account of their exercise of a fundamental right, we must reverse the district court's dismissal of their equal protection claim as well. *See Tele-Communications of Key West, Inc. v. United States*, 757 F.2d 1330, 1340 (D.C. Cir. 1985) (allegation of differential treatment without satisfactory justification states equal protection claim); *see also Police Department of City of Chicago v. Mosley*, 408 U.S. 92, 94–95 (1972) (analyzing city's differential treatment of plaintiff's picketing under Equal Protection Clause). Although we can think of good reasons why the *Pickering* balancing test should apply to both claims, *see Rogers v. Corbett*, 468 F.3d 188, 193–94 (3d Cir. 2006) (abandoning traditional tiers of equal protection scrutiny and applying *Anderson v. Celebrezze*, 460 U.S. 780 (1983), balancing test to equal protection claim challenging ballot access restriction), this issue is also unbriefed, and we think it best to leave it too for the district court to wrestle with should the parties choose to pursue it.

## III.

We reverse and remand for further proceedings consistent with this opinion.

*So ordered.*