DYK, Circuit Judge,
concurring in part and dissenting in part, with whom Circuit Judges LOURIE and REYNA join with respect to parts I, II, III, and IV.
The majority is correct that the bar on registration of disparaging marks is unconstitutional as applied to Mr. Tam. But in my view the majority errs in going beyond the facts of this case and holding the statute facially unconstitutional as applied to purely commercial speech.
It is noteworthy that the majority seeks to justify its sweeping holding by describing § 2(a) as being something it is not. The provision bars the registration of marks that “disparage -... or bring into contempt, or disrepute.” 15 U.S.C. § 1052(a) (otherwise identified as § 2(a)). The majority repeatedly asserts that “[t]he government enacted § 2(a), and defends it today, because it is hostile to the messages conveyed by the refused marks.”[1] Maj. *1364 Op. at 1337. In my view, there is nothing in the statute itself or the legislative history that supports this interpretation. On its face, and as interpreted by the Trademark Trial and Appeal Board (“the Board”), the statute is designed to preclude the use of government resources not when the government disagrees with a trademark’s message, but rather when its meaning “may be disparaging to a substantial composite of the referenced group.” In re Lebanese Arak Corp., 94 U.S.P.Q.2d 1215, 1217 (T.T.A.B.2010) (emphasis added). The PTO uses an objective test in making this determination, looking to dictionaries, the relationship of the matter to the other elements of the mark, the nature of the goods or services, and the manner in which the mark is used in the marketplace in connection with the goods or services. See id.[2]
Thus the purpose of the statute is to protect underrepresented groups in our society from being bombarded with demeaning messages in commercial advertising. The question is whether the statute so designed can survive First Amendment scrutiny. My answer is that the statute is constitutional as applied to purely commercial trademarks, but not as to core political speech, of which Mr. Tam’s mark is one example. Ultimately, unlike the majority, I do not think that the government must support, or society tolerate, disparaging trademarks in the name of commercial speech. The majority’s opinion not only invalidates the bar on disparaging marks in § 2(a) but may also effectively invalidate the bar on scandalous marks and the analogous provisions of the Model State Trademark Act. See 1964 Model State Trademark Act, § 2(b). The government need not support the inevitable consequence of this decision — “the wider registration of marks that offend vulnerable communities.” Maj. Op. at 1357-58.
I
As the majority notes, the Supreme Court has long recognized the protection of offensive speech that constitutes core political expression. “The right to free speech ... may not be curtailed simply because the speaker’s message may be offensive to his audience.” Hill v. Colorado, 530 U.S. 703, 716, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). Underpinning the First Amendment’s protection of core speech that is disparaging is the fundamental constitutional value of preserving an “uninhibited marketplace of ideas in which truth will ultimately prevail,” a marketplace that provides “suitable access to social, political, esthetic, moral, and other ideas and experiences.” Red Lion, 395 U.S. at 390, 89 S.Ct. 1794. Integral to an “uninhibited marketplace of ideas” is the ability to incite debate. “[A] principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.” Texas v. *1365 Johnson, 491 U.S. 397, 408-09, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Thus to maintain a “meaningful dialogue of ideas,” “we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.” Snyder v. Phelps, 562 U.S. 443, 452, 458, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011) (internal quotation marks, citations, and alterations omitted).[3] At bottom, as Justice Holmes described, in the core speech area the First Amendment enshrines the “principle of free thought — not free thought for those who agree with us but freedom for the thought that we hate.” U.S. v. Schwimmer, 279 U.S. 644, 654-55, 49 S.Ct. 448, 73 L.Ed. 889 (1929) (Holmes, J., dissenting).
. But this principle simply does not apply in the commercial context. For example, it is well established that racially or sexually disparaging speech in the workplace, when severe, may constitute a violation of Title VII, either as harassment or the creation of a hostile work environment. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Rodgers v. Western-Southern Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993). The same is necessarily true in the context of federal public accommodations law governing commercial establishments. No case of which I am aware suggests that imposing liability for disparaging speech in those commercial contexts,, even when separated from conduct, violates the First Amendment.
So too in the area of commercial speech race or sex disparagement can claim no First Amendment protection. Unlike core political expression, the “extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides.” Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio, 471 U.S. 626, 651, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985). Its constitutional protection derives not from any dialogic function in the marketplace of ideas, but rather from its “informational function” in the marketplace of goods and services, Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm’n of N.Y., 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), in other words, “who is producing and selling what product, for what reason, and at what price.” Va. State Bd. Of Pharmacy v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); see also Sorrell v. IMS Health Inc., — U.S. -, 131 S.Ct. 2653, 2673-74, 180 L.Ed.2d 544 (2011) (Breyer, J., dissenting). We protect the dissemination of this information to ensure that “private economic decisions” are “intelligent and well informed.” Va. State Bd. Of Pharmacy, 425 U.S. at 765, 96 S.Ct. 1817.
Speech proposing a commercial transaction is “an area traditionally subject to government regulation.” 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 499, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (citing and quoting Ohralik v. Ohio State Bar Ass’n, 436 U.S. 447, 456, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978)). The Court has “been careful to distinguish commercial speech from speech at the First Amendment’s core,” Florida Bar v. Went For It, Inc., 515 U.S. 618, 623, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), recognizing the “commonsense distinctions that exist between commercial and noncommercial speech.” 44 Liquormart, 517 U.S. at 502, 116 S.Ct. 1495 (quoting Virginia Bd. of Pharmacy, *1366 425 U.S. at 771 n. 24, 96 S.Ct. 1817). The “greater objectivity” and “greater hardiness” of commercial speech and the different constitutional values underlying its protection “likely diminish[] the chilling effect that may attend its regulation.” 44 Liquormart, 517 U.S. at 499, 116 S.Ct. 1495 (internal quotation marks and citations omitted). Accordingly, the Court has explained that “the State may regulate some types of commercial advertising more freely than other forms of protected speech,” id. at 498, 116 S.Ct. 1495 (internal quotations marks and citations omitted), and “the State may at times prescribe what shall be orthodox in commercial advertising,” Hurley v. Irish-American Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (internal quotation marks and citations omitted) — something it could never do with core political speech.
Recognizing the more limited protection of commercial speech, the Court has repeatedly upheld regulations “protecting] consumers from misleading, deceptive, or aggressive sales practices,” because such regulations are “consistent with the reasons for according constitutional protection to commercial speech” in the first place. 44 Liquormart, 517 U.S. at 501, 116 S.Ct. 1495; see also, e.g., Florida Bar, 515 U.S. 618, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981); Bates v. State Bar of Ariz., 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). “There can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity.” Central Hudson, 447 U.S. at 563, 100 S.Ct. 2343.
This stands in stark contrast to core political speech, for which “constitutional protection does not turn upon ‘the truth ... of the ideas and beliefs which are offered.’” N.Y. Times Co. v. Sullivan, 376 U.S. 254, 271, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting NAACP v. Button, 371 U.S. 415, 445, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)). “The erroneous statement is inevitable in free debate, and [ ] it must be protected [absent a showing of actual malice] if the freedoms of expression are to have the breathing space that they need to survive.” Id. at 271-72, 84 S.Ct. 710 (internal quotation marks, citations, and alterations omitted). “Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth.” N.Y. Times, 376 U.S. at 271, 84 S.Ct. 710. See also Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 52, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).
To be sure, the Court has held that commercial advertising cannot be restricted just because the product or service may be offensive to some members of the audience. See Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 71, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983); Carey v. Population Servs. Int'l 431 U.S. 678, 701, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). But, at the same time, the Court has explained that the manner of advertising itself may be restricted to protect the audience’s privacy interests. See Florida Bar v. Went For It, Inc., 515 U.S. 618, 630, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). “[T]he existence of [First Amendment] protection does not deprive the State of all power to regulate such advertising in order to minimize its offensiveness.” Bolger, 463 U.S. at 84, 103 S.Ct. 2875 (1983) (Stevens, J., concurring) (citing and quoting from Carey, 431 U.S. at 716, 97 S.Ct. 2010 (Stevens, J., concurring)).
For example, in Florida Bar the Court upheld a ban on lawyer advertising targeted to recent accident victims and their families. 515 U.S. at 634-35, 115 S.Ct. *1367 2371. There the Court distinguished Bol-ger, which rejected a total ban on advertising related to contraceptives, because the government’s interest in Bolger had been only to shield citizens from generally “offensive” and “intrusive” products. See id. at 630-31, 115 S.Ct. 2371. That interest, the Court explained, was entirely different from the interest in “protecting the personal privacy and tranquility of [Florida’s] citizens from crass commercial intrusion by attorneys upon their personal grief in times of trauma.” Id. at 630, 115 S.Ct. 2371 (alterations omitted). The Court thus had “little trouble crediting the Bar’s” “privacy-based” interest as “substantial,” and held that it was sufficient to justify the advertising ban. Id. at 625, 629, 635, 115 S.Ct. 2371.
Disparagement as defined by the Board “is essentially a violation of one’s right of privacy — the right to be let alone from contempt or ridicule.” TMEP § 1203.03(b). While in the trademark context the dissemination of the disparaging material is not limited to the disparaged group, the disparaged group is nonetheless targeted in the sense that it is singled out for ridicule. Furthermore, the fact that the dissemination of the disparaging advertising is not limited to the disparaged group makes the government’s interest here all the greater — the effect on the disparaged group is amplified, not lessened, by disseminating the disparaging material to the public at large.
This well-recognized disparity in the types of restrictions that are permissible as applied to commercial as opposed to political speech derives from the very different constitutional values underlying their protection in the first place. The Court has recognized that the government has greater authority to “distinguish between the relative value of different categories of commercial speech” than of noncommercial speech. Metromedia, 453 U.S. at 514, 101 S.Ct. 2882. Specifically, the government has a distinct and substantial interest in “proscribing intrusive and unpleasant formats” for commercial expression. Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984); see also Lehman v. City of Shaker Heights, 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974); Metromedia, 453 U.S. at 514, 101 S.Ct. 2882. Indeed, “it may not be the content of the speech, as much as the deliberate ‘verbal or visual assault,’ that justifies proscription.” Hill, 530 U.S. at 716, 120 S.Ct. 2480 (quoting Erznoznik v. Jacksonville, 422 U.S. 205, 210-11, n. 6, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975)).
Unlike core political speech, where offensiveness or disparagement has recognized value in its tendency to provoke debate, disparagement in commercial advertising furthers no First Amendment value. Indeed, neither counsel at oral argument nor the majority in its opinion has identified any First Amendment value served by disparaging speech in the commercial context. Thus even blanket bans on commercial speech may be the kind of consumer protective regulations that are consistent with the “informational function” of commercial advertising. See Central Hudson, 447 U.S. at 563, 100 S.Ct. 2343.
The majority, apparently recognizing that purely commercial speech is entitled to lesser protection, urges that all disparaging trademarks deserve heightened First Amendment protection because they have an expressive component. See Maj. Op. at 1337-38. While I agree that some marks, including Mr. Tam’s, have an expressive component, it would seem beyond debate that many do not, as is the case with respect to routine product identifiers. Indeed, the Supreme Court confirmed the lack of an expressive component in most *1368 trade names in Friedman v. Rogers, where it explicitly distinguished between advertisements that “editorialize on any subject, cultural, philosophical, or political,” which might be entitled to greater First Amendment protection, and the “mere solicitation of patronage implicit in a trade name,” which “is a form of commercial speech and nothing more.” 440 U.S. 1, 11, n. 10, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). The Court again recognized this distinction in S.F. Arts & Athletics Inc. v. U.S. Olympic Comm’n, 483 U.S. 522, 535, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987). “To the extent that [the statute] applies to uses for the purpose of trade [or] to induce the sale of any goods or services, its application is to commercial speech.” Id. (alterations omitted).
In short, many trademarks lack the kind of “expressive character” that would merit First Amendment protection for offensive content, and a regulation of the use of those marks could satisfy the Central Hudson test for commercial speech — a substantial government interest reflected in a narrowly tailored regulation. The majority’s contrary conclusion seems to me to be unsupported.
II
.Even if disparaging commercial speech were protected from government ban or regulation, this case does not turn on the legitimacy of a regulation or a “blanket ban” on disparaging commercial speech. The refusal to register disparaging marks is not a regulation or “blanket ban” on anything. Rather, it involves the denial of a subsidy, and because it is a subsidy, it may be content based. It is “well established that the government can make content-based distinctions when it subsidizes speech.” Davenport v. Wash. Educ. Ass’n, 551 U.S. 177, 188-89, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007). The First Amendment “does not confer an affirmative right to use government [] mechanisms for the purpose of’ expression, nor is the government “required to assist others in funding the expression of particular ideas, including political ones.” Ysursa v. Pocatello Educ. Ass’n, 555 U.S. 353, 355, 358, 129 S.Ct. 1093, 172 L.Ed.2d 770 (2009) (internal quotations and citations omitted). Significantly, every single Supreme Court decision upholding the protection of commercial speech has involved a prohibition or restriction of speech — not a subsidy.[4]
That trademark registration is a subsidy is not open to doubt. Contrary to the majority’s characterization, federal trademark registration is not a “regulatory regime.” Maj. Op. at 1353. Section 2(a) does not regulate any speech, much less impose a blanket ban. It merely deprives a benefit. The majority claims that federal trademark registration is not a subsidy because “the subsidy cases have all involved government funding or government property.” Maj. Op. at 1351. But this assertion is belied by the Court’s recent decisions in Davenport and Ysursa — neither involving government funding or property. Each made clear that the government can make content-based distinctions when it provides a benefit.
*1369 In Daven/port, the Court considered a government benefit that gave unions “the power, in essence, to tax government employees,” by having the state collect fees from its employees on behalf of the unions. Davenport, 551 U.S. at 184, 127 S.Ct. 2872. The state limited this collection mechanism by refusing to collect nonmember fees for election-related purposes unless the nonmember affirmatively consented. Id. at 180, 127 S.Ct. 2372. The unions argued that this restriction was an unconstitutional content-based discrimination. Id. at 188, 127 S.Ct. 2372. The Court disagreed. The First Amendment’s usual aversion to content-based speech regulation is inapposite when “the government is acting in a capacity other than as regulator,” such as “when it subsidizes speech.” Id. at 188, 127 S.Ct. 2372. Because the collection of nonmember fees was a “state-bestowed entitlement,” “a matter of grace [that] [it] can, of course, disallow ... as it chooses,” Regan v. Taxation With Representation of Wash., 461 U.S. 540, 549, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983) (internal quotations and citations omitted), the content-based condition on that benefit did not raise a “realistic possibility that official suppression of ideas is afoot.” Davenport, 551 U.S. at 189-90, 127 S.Ct. 2372 (citations and quotation marks omitted). The unions remained “as free as any other entity to participate in the electoral process with all available funds other than the state-coerced agency fees.” Id. at 190, 127 S.Ct. 2372. Thus the Court declined to apply heightened scrutiny and upheld the restriction in light of the state’s “narrow” and legitimate interest in “protect[ing] the integrity of the election process.” See id. at 189-90, 127 S.Ct. 2372.
In Ysursa, the Court considered a similar benefit where the state collected dues on behalf of unions by providing payroll deductions. Ysursa, 555 U.S. at 355, 129 S.Ct. 1093. The state restricted that collection mechanism by preventing unions from using payroll deductions for any political purposes. Id. Again the unions argued that this restriction was an impermissible content-based speech restriction, and again the Court disagreed. The First Amendment “protects the right'to be free from government abridgement of speech,” not the right to be “assisted] [ ] in funding the expression of particular ideas.” , Id. at 358, 129 S.Ct. 1093. “While publicly administered payroll deductions for political purposes can enhance the unions’ exercise of First Amendment rights, Idaho is under no obligation to aid the unions in their political activities.” Id. at 359, 129 S.Ct. 1093. Because collecting payroll deductions was a government benefit, the State’s decision not to extend that benefit was “not an abridgement of the unions’ speech.” Id. As in Davenport, the unions remained “free to engage in such speech as they see fit. They simply are barred from enlisting the State in support of that endeavor.” Id. Thus the Court again declined to apply heightened scrutiny and upheld the regulation in light of the “government’s interest” in “avoiding the reality or appearance of government favoritism.” Id.
The same is true here. Federal trademark registration, like the state-bestowed collection mechanisms for unions in Davenport and Ysursa, is a government-bestowed collection mechanism for enforcing trademarks. It opens the federal courts to enforce trademark rights by providing, inter alia, original jurisdiction in federal courts for infringement claims, eligibility for treble damages for willful infringement, the ability to petition Customs to prevent the importation of infringing articles, and various enhanced protections for marks. See 15 U.S.C. §§ 1057(c), 1141, 1117, 1124. These benefits all “enlist” the government in support of the mark holder’s commercial identification, much like the collection of nonmember fees in Dav *1370 enport and the payroll deductions in Ysur-sa enlisted the states in support of the unions’ political speech. See Ysursa, 555 U.S. at 859, 129 S.Ct. 1093. Just as the states were not obligated to enable labor unions to collect nonmember fees or take payroll deductions in the first place, the federal government is not obligated to provide these benefits of a trademark enforcement mechanism. And just as the unions remained free to speak for election-related purposes using all other funds, trademark holders remain free to use their marks— however disparaging — as far as the federal government is concerned.[5] That states may deny state-law protection to these marks cannot make the denial of the federal subsidy any less constitutional.
Finally, the majority argues that § 2(a) should be treated as a regulatory provision because- the denial of registration benefits will have a chilling effect on the use of disparaging marks and cause mark holders to abandon such marks. See Maj. Op. at 1342-43. But that is commonly the effect of the denial of subsidies, as the Supreme Court has recognized. See Regan, 461 U.S. at 550, 103 S.Ct. 1997 (“Although TWR does not have as much money as it wants, and thus cannot exercise its freedom of speech as much as it would like,” the decision not to subsidize its speech does not violate the First Amendment). A chilling effect does not turn a subsidy provision into a regulatory provision, so long as the subsidy is not designed to limit speech outside of the subsidized program. That is not the case here.
“[T]he relevant distinction that has emerged from our cases is between conditions that define the limits of the government spending program — those that specify the activities Congress wants to subsidize — -and conditions that seek to leverage funding to regulate speech outside the contours of the program itself.” Agency for Int’l Dev. v. Alliance for Open Soc’y Int’l, Inc., — U.S. -, 133 S.Ct. 2321, 2328, 186 L.Ed.2d 398 (2013) {“AID ”). An example of such impermissible leverage was found in FCC v. League of Women Voters, where federal funds were denied to public broadcasters if they engaged in editorializing. 468 U.S. 364, 399-401, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984). The restriction was invalidated because it affected editorializing engaged in without federal funds. Id. Section 2(a) is not designed to limit speech outside of the federal trademark program. Accordingly, it does not run afoul of the unconstitutional conditions doctrine.[6] See id.
The majority’s contrary arguments are the very arguments rejected in the Supreme Court’s recent decision in AID. See 133 S.Ct. at 2328. AID explicitly disclaimed the majority’s assertion that the condition must be limited to “advancing the goals underlying the program the government seeks to fund.” Maj. Op. at 1354. The question is not whether “the condition is [ ] relevant to the objectives of the program,” but rather whether the condition “seek[s] to leverage funding to regulate speech outside the contours of the pro *1371 gram itself,” which the restriction here does not. AID, 133 S.Ct. at 2328. Similarly, in Regan the Court upheld a requirement that nonprofit organizations seeking tax-exempt status under 26 U.S.C. § 501(c)(3) not engage in lobbying. 461 U.S. at 544, 103 S.Ct. 1997. The Court upheld that condition not because it was related in some way to the “goals” of 501(c)(3) tax exemption, but rather because “the condition did not prohibit that organization from lobbying Congress” with separate funds, ie., it did not leverage funds outside of the nonprofit structure. Id. at 2329. The majority’s arguments fail to show a colorable violation of the unconstitutional conditions doctrine here.
Ill
The majority urges, however, that subsidies require viewpoint neutrality, and argues that the subsidy provided by § 2(a) discriminates based on viewpoint because favorable racial and other marks are allowed while disparaging ones are not. See Maj. Op. at 1336-38. Contrary to the majority, the Supreme Court has never held that this kind of subsidy must be viewpoint neutral. The question was raised, but not answered, in Davenport and Ysursa. See Davenport, 551 U.S. at 189, 127 S.Ct. 2372 (“Even if it be thought necessary that the content limitation be reasonable and viewpoint neutral ... ”); Ysursa, 555 U.S. at 361, n. 3, 129 S.Ct. 1093. And the Court has upheld subsidies that were facially viewpoint discriminatory. See, e.g., Rust v. Sullivan, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (upholding a condition limiting Title X funding to clinics that do not advocate abortion as a method of family planning). The Court made an exception in a subsidy ease involving the unique context of legal services, where “the traditional role of the [subsidized] attorneys” is to “speak[ ] on the behalf of his or her private, indigent client” and viewpoint discrimination undermined the very purpose of the subsidy. Legal Servs. Corp. v. Velazquez, 531 U.S. 533, 542, 544, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001). There is no tradition of unfettered advocacy in commercial advertising. Thus even if the regulation here could be deemed viewpoint discriminatory, it would not fail under the First Amendment. See Davenport, 551 U.S. at 189, 127 S.Ct. 2372.
But § 2(a) is in any event viewpoint neutral. In Boos v. Barry, 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), the Court addressed a nearly identical standard as applied to core political speech. The law there prohibited the display of any sign within 500 feet of a foreign embassy if the sign would tend to bring that foreign government into “public odium” or “disrepute.” Id. at 315, 108 S.Ct. 1157. Justice O’Connor’s plurality opinion confirmed that the restriction is “content-based,” but it specifically found that “the provision is not viewpoint based.” Id. at 319, 108 S.Ct. 1157 (emphasis added). “The display clause determines which viewpoint is acceptable in a neutral fashion by looking to the policies of foreign governments.” Id. (emphasis added). This “prevents the display clause from being directly viewpoint based, a label with potential First Amendment ramifications of its own.” Id. This aspect of the plurality opinion has since been cited with approval by a majority of the Court in Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 645, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). The same reasoning applies here. Just as the restriction in Boos operated in a “neutral fashion” by looking only to foreign governments, the bar on registration of disparaging marks operates in a “neutral fashion” by looking only to the views of the referenced group. Accordingly, just as the restriction in Boos was viewpoint neutral, so too is § 2(a). In Ridley v. Massachusetts Bay Transportation Authority, 390 F.3d 65 (1st Cir.2004), *1372 the First Circuit arrived at the same conclusion, holding that a regulation “prohibit[ing] demeaning or disparaging ads” was viewpoint neutral because “the state is not attempting to give one group an advantage over another in the marketplace of ideas.” Id. at 90-91.
Finding § 2(a) to be viewpoint neutral is consistent with the Court’s treatment of viewpoint discrimination in other areas. The Court has defined viewpoint discrimination as the government’s disagreement with the underlying “ideology,” “opinion” or “perspective of the speaker.” Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). Here, as in Boos, the standard is not based on the government’s disagreement with anything. Rather, it is based on an objective, “neutral” assessment of a non-government perspective — in this case, a “substantial composite of the referenced group.” As in Davenport and Ysursa, there is no “realistic possibility that official suppression of ideas is afoot,” Davenport, 551 U.S. at 190, 127 S.Ct. 2372 and the content-based regulation here is not subject to heightened First Amendment scrutiny.
TV
Even in subsidy cases, however, the government needs some interest sufficient to justify its regulation defined in terms of “reasonableness.” See Ysursa, 555 U.S. at 359, 129 S.Ct. 1093; Regan, 461 U.S. at 550, 103 S.Ct. 1997. In my view, the protection of disparaged groups is sufficient. As demonstrated on college campuses across the nation, members of .some groups, whether or not justified, are particularly sensitive to disparaging material.[7] There is significant social science evidence demonstrating the harmful psychological effects of holding a minority group up for ridicule on a national stage, particularly on children and young adults.[8] In the case of core protected speech, as discussed above, the government has no legitimate interest in protecting disparaged groups. The groups must tolerate the disparagement in pursuit of the greater goal of a free marketplace of ideas. But, as discussed above, commercial speech is different. Disparagement as defined by the Board “is essentially a violation of one’s right of privacy' — -the right to be let alone from contempt or ridicule.” TMEP § 1203.03(c).
The government has an interest in “proscribing intrusive and unpleasant formats” for commercial expression. Taxpayers for Vincent, 466 U.S. at 806, 104 S.Ct. 2118; see also Lehman, 418 U.S. at 304, 94 S.Ct. 2714; Metromedia, 453 U.S. at 514, 101 S.Ct. 2882. The Supreme Court’s “precedents [ ] leave no room for doubt .that the protection of potential clients’ privacy is a substantial state interest.” Florida Bar, 515 U.S. at 625, 115 S.Ct. 2371 (internal quotations marks omitted). We need not decide whether this interest is sufficiently compelling to justify a ban of disparaging commercial speech. It is more than sufficient to justify the government’s “decision not to assist” disparaging commercial expression. Ysursa, 555 U.S. at 360 n. 2, 129 *1373 S.Ct. 1093; Taxpayers for Vincent, 466 U.S. at 806, 104 S.Ct. 2118. At the same time, there is no countervailing First Amendment interest. It is certainly difficult to imagine, for example, how the disparaging elements of an advertisement such as “CHLORINOL SODA BLEACHING — we are going to use Chlorinol and be like de white nigger,”[9] or “The Plucky Little Jap Shredded Wheat Biscuit,”[10] or “Dr. Scott’s Electric Hair Brush — will not save an Indian’s scalp from his enemies but it will preserve yours from dandruff,” [11] further any legitimate “informational function” associated with the relevant product.
V
Finally, contrary to the majority’s implication, it is quite feasible to distinguish between core and commercial speech. Congress has already determined that trademark law should distinguish between pure commercial speech and fully protected speech. Section 1125(c)(3) of title 15 excludes from liability for dilution parody, criticism, and any noncommercial use of a mark. And the noncommercial use of a mark, for parody, as an example, weighs against likelihood of confusion. See, e.g., Rogers v. Grimaldi, 875 F.2d 994 (2d Cir.1989); Davis v. Walt Disney Co., 430 F.3d 901 (8th Cir.2005); see also Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ’g Group, Inc., 886 F.2d 490, 494-95 (2d Cir.1989) (“the expressive elements of titles require[] more protection than the labeling of ordinary commercial products ... so here the expressive element of parodies requires more protection than the labeling of ordinary products.”). Congress has made a similar judgment in the copyright context. See 17 U.S.C. § 107 (one of four fair use factors includes assessing whether the use is commercial). I see no reason why the Board would be unable to make' such distinctions here.
VI
Turning from the application of § 2(a) to commercial speech to the facts of this case, I agree with the majority that the bar on registration of disparaging marks is unconstitutional as applied to Mr. Tam. Here there can be no doubt that Mr. Tam’s speech is both political and commercial. Unlike Friedman, where the trade name proponent did “not wish to editorialize on any subject, cultural, philosophical, or political,” 440 U.S. at 11, 99 S.Ct. 887 Mr. Tam’s choice of mark reflects a clear desire to editorialize on cultural and political subjects. Mr. Tam chose THE SLANTS at least in part to reclaim the negative racial stereotype it embodies: “We want to take on these stereotypes that people have about us, like the slanted eyes, and own them. We’re very proud of being Asian— we’re not going to hide that fact.” In re Simon Shiao Tam, 108 U.S.P.Q.2d 1305, 2013 WL 5498164 at *2 ,(T.T.A.B.2013). See Maj. Op. at 1332 (Mr. Tam “selected the mark in order to ‘own’ the stereotype it represents.”).
Given the indisputably expressive character of Mr. Tam’s trademark in this case, the government’s recognized interests in protecting citizens from targeted, demeaning advertising and proscribing intrusive formats of commercial expression — interests that are sufficient to justify the provi *1374 sion as applied to commercial speech' — -are insufficient to justify application of the provision to Mr. Tam. As discussed, because of the fundamental values underlying the First Amendment’s robust protection of offensive speech that are unique to core political expression, the government cannot justify restricting disparaging trademarks when those marks, like Mr. Tam’s, actually consist of core expression. See, e.g., Snyder, 562 U.S. at 459-61, 131 S.Ct. 1207. Accordingly, because no government interest can justify restricting Mr. Tam’s core speech on the basis of its capacity to injure others, § 2(a) is invalid as applied. This also explains why the majority’s concern regarding copyright is misplaced. See, e.g., Maj. Op. at 1354-55. Copyrights, unlike trademarks, principally cover core protected expression. Thus, as for Mr. Tam, any government interest related to suppressing offensive speech would be insufficient to justify a comparable restriction as applied to copyright registration except for commercial advertising.
No case before the majority’s opinion today has imposed an obligation on the government to subsidize offensive,, commercial speech. As Judge Lourie points out, the bar on registration of disparaging marks is longstanding, and we have previously upheld it in a number of decisions. I see no basis for invalidating it now as applied to commercial speech. I would adhere to those decisions in this respect, and I respectfully dissent.

. The majority frequently characterizes the statute as "discriminating] on the basis of message conveyed” .and hence "viewpoint.” Maj. Op. at 1335. "It does so as a matter of avowed and undeniable purpose, and it does so on its face.” Id. "Denial of these benefits creates a serious disincentive to adopt a mark *1364 which the government may deem offensive or disparaging.” Id. at 1341. "The entire interest of the government in § 2(a) depends on disapproval of the message.” Id. at 1355. "All of the government’s proffered interests boil down to permitting the government to 'burden speech it finds offensive.” Id. at 1357.

. To be sure, the Board may have rendered inconsistent results in some cases, but this has no bearing on the facial validity of § 2(a). See, e.g., Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 587, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); Red Lion Broad. Co. v. F.C.C., 395 U.S. 367, 396, 89 S.Ct. 1794, 23. L.Ed.2d 371 (1969). In any event, when the government is not acting in its sovereign, regulatory capacity, "the consequences of imprecision are not constitutionally severe.” Finley, 524 U.S. at 589, 118 S.Ct. 2168.

. See also, e.g., Cohen v. California, 403 U.S. 15, 25, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Hess v. Indiana, 414 U.S. 105, 107, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973); Denver Area Educ. Telecomm. Consortium, Inc. v. F.C.C., 518 U.S. 727, 753-54, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996).

. See, e.g., Linmark Assocs., Inc. v. Twp. of Willingboro, 431 U.S. 85, 97, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (striking down a ban on placing "For Sale” and "Sold” signs on residential property); Carey, 431 U.S. at 701-02, 97 S.Ct. 2010 (invalidating a ban on all advertising and display of contraceptives); Bolger, 463 U.S. at 71, 103 S.Ct. 2875 (invalidating a ban on unsolicited mailing of contraceptive advertisements); Va. State Bd. of Pharmacy, 425 U.S. at 773, 96 S.Ct. 1817 (invalidating a ban on advertising prescription drug prices); Sorrell v. IMS Health Inc., - U.S. -, 131 S.Ct. 2653, 2659, 180 L.Ed.2d 544 (2011) (invalidating a state law that prohibited the sale, disclosure, and use of pharmacy records without the prescriber’s consent and subject to limited exceptions).

. That alternative federal enforcement under 15 U.S.C. § 1125(a) is potentially available to denied applicants only bolsters this point. See Maj. Op. at 1344-45 n. 11.

. Bullfrog Films, Inc. v. Wick, 847 F.2d 502, 503 (9th Cir.1988), Dep't of Tex., Veterans of Foreign Wars v. Tex. Lottery Comm'n, 760 F.3d 427, 430 (5th Cir.2014) (en banc), and Autor v. Pritzker, 740 F.3d 176, 177 (D.C.Cir.2014), relied on by the majority, Maj. Op. at 1351— 53, are all inapposite. In all three cases, the government was attempting to leverage speech outside of the “contours” of its defined program, thus running afoul of the unconstitutional conditions doctrine. Here, on the other hand, no expression beyond the trademark is suppressed, and therefore no unconstitutional condition obtains.

. See, e.g., Chuck Culpepper, How Missouri foot-ball's boycott helped bridge a familiar campus divide, Wash. Post (Nov. 13, 2015), https://www.washingtonpost.com/sports/ colleges/howmissouri-footballs-boycott-helped-unite-a-troubled-campus/2015/11/13/ 64fe68ea-8a0f-lle5-be8b-lae2e4f50f76— story.html.

. See, e.g., American Psychological Ass'n, APA Resolution Recommending the Immediate Retirement of American Indian Mascots, Symbols, Images, and Personalities by Schools, Colleges, Universities, Athletic Teams, and Organizations (2011), available at http://www. apa.org/about/policy/mascots.pdf (citing many studies finding psychological harni of exposure to negative stereotypes).

. Julian Casablancas, 15 Shockingly Racist Vintage Ads, Business Pundit (Dec. 17, 2012), http://www.businesspundit.com/15-shockingly-racist-vintage-ads/?img=42884.

. Dan Beard, 24 Recreation 1 (.1905) available at https://books.google.com/books?id= LPQXAAAAYAAJ & pg= PA474-IA18# v=onepage & g & f=false.

.Brian D. Behnken & Gregory D. Smithers, Racism in American Popular Media: From Aunt Jemima to the Frito Bandito 39 (2015).